ORIGINAL

Approved: _____
JANIS ECHENBERG/ROBERT BOONE/DAVID ZHOU/MATTHEW PODOLSKY
Assistant United States Attorneys

Before:  THE HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York

16 MAG 6005

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :        **SEALED COMPLAINT**
                                :
   - v. -                       :        Violations of
                                :        18 U.S.C. §§ 666, 1001,
JOSEPH PERCOCO,                 :        1349, 1951, and 2
   a/k/a "Herb,"                :
ALAIN KALOYEROS,                :
   a/k/a "Dr. K,"               :
PETER GALBRAITH KELLY, JR.,     :
   a/k/a "Braith,"              :        COUNTY OF OFFENSE:
STEVEN AIELLO,                  :        NEW YORK
JOSEPH GERARDI,                 :
LOUIS CIMINELLI,                :
MICHAEL LAIPPLE, and            :
KEVIN SCHULER,                  :
                                :
               Defendants.      :
                                :
- - - - - - - - - - - - - - - - x



SOUTHERN DISTRICT OF NEW YORK, ss.:

DELEASSA PENLAND, being duly sworn, deposes and says that she is a Criminal Investigator with the United States Attorney's Office for the Southern District of New York ("USAO"), and charges as follows:

## COUNT ONE

(Conspiracy to Commit Extortion Under Color of Official Right)

1.   From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1951.

2.     It was a part and an object of the conspiracy that JOSEPH PERCOCO, a/k/a "Herb," the defendant, and others known and unknown, willfully and knowingly, would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951, to wit, PERCOCO, who was a senior official in the Office of the Governor of New York State (the "State"), and others known and unknown, would and did cause companies with business before the State to direct payments to PERCOCO in exchange for official actions taken or to be taken by PERCOCO for the benefit of the companies paying him.

(Title 18, United States Code, Sections 1951.)

## COUNT TWO

(Extortion Under Color of Official Right – The Energy Company)

3.     From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," the defendant, willfully and knowingly, would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951, to wit, PERCOCO used his official State position and power and authority within the Office of the Governor to cause an energy company seeking benefits and business from the State (the "Energy Company") to make and direct payments to PERCOCO's wife in exchange for official actions taken and agreed to be taken by PERCOCO.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT THREE

(Extortion Under Color of Official Right – The Syracuse Developer)

4.     From at least in or about 2014, up to and including in or about 2015, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," the defendant, willfully and knowingly, would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion as that term is defined in Title 18, United States Code, Section 1951, to wit, PERCOCO

used his official State position and power and authority within the Office of the Governor to cause a Syracuse-based real estate developer seeking benefits and business from the State (the "Syracuse Developer") to make and direct payments to PERCOCO in exchange for official actions taken and agreed to be taken by PERCOCO.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT FOUR

(Conspiracy to Commit Honest Services Fraud)

5.    From at least in or about 2012, up to and including in or about 2015, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," PETER GALBRAITH KELLY, JR., a/k/a "Braith," STEVEN AIELLO, and JOSEPH GERARDI, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1346.

6.    It was a part and an object of the conspiracy that JOSEPH PERCOCO, a/k/a "Herb," PETER GALBRAITH KELLY, JR., a/k/a "Braith," STEVEN AIELLO, and JOSEPH GERARDI, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to PERCOCO's honest services as a senior official in the Office of the Governor, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, PERCOCO, while serving as Executive Deputy Secretary to the Governor, would and did take official action in return for bribes paid, at the direction of KELLY, AIELLO, and GERARDI, by the Energy Company and the Syracuse Developer.

(Title 18, United States Code, Section 1349.)

## COUNT FIVE

(Solicitation of Bribes and Gratuities - The Energy Company)

7.    From at least in or about 2012, up to and including in or about 2016, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," the defendant, being an agent of a State government, to wit, a senior official in the Office of the Governor, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such government and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, PERCOCO, in his capacity as a senior official in the Office of the Governor, solicited and accepted cash and things of value from the Energy Company intending for PERCOCO to be influenced and rewarded.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT SIX

(Solicitation of Bribes and Gratuities - The Syracuse Developer)

8.    From at least in or about 2014, up to and including in or about 2015, in the Southern District of New York and elsewhere, JOSEPH PERCOCO, a/k/a "Herb," the defendant, being an agent of a State government, to wit, a senior official in the Office of the Governor, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of such government and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, PERCOCO, in his capacity as a senior official in the Office of the Governor, solicited and accepted cash and things

of value from the Syracuse Developer intending for PERCOCO to be influenced and rewarded.

(Title 18, United States Code, Sections 666(a)(1)(B) and 2.)

## COUNT SEVEN

(Payments of Bribes and Gratuities - The Energy Company)

9.    From at least in or about 2012 to at least in or about 2016, in the Southern District of New York and elsewhere, PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, who was an executive at the Energy Company, willfully and knowingly did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization of a State government, and an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, KELLY offered and gave bribes to JOSEPH PERCOCO, a/k/a "Herb," the defendant, in order for PERCOCO to influence regulatory approvals and funding related to the development of a power plant in Orange County, New York, and take other official action to benefit the Energy Company.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT EIGHT

(Payments of Bribes and Gratuities - The Syracuse Developer)

10.    From at least in or about 2014 to at least in or about 2015, in the Southern District of New York and elsewhere, STEVEN AIELLO and JOSEPH GERARDI, the defendants, who were executives at the Syracuse Developer, willfully and knowingly did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization of a State government, and an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in

5

excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, AIELLO and GERARDI offered and gave bribes to JOSEPH PERCOCO, a/k/a "Herb," the defendant, in order for PERCOCO to promote the Syracuse Developer's development projects in the State and take other official action to benefit the Syracuse Developer.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT NINE

(Wire Fraud Conspiracy – The Preferred Developer RFPs)

11.   From at least in or about 2013, up to and including in or about 2015, in the Southern District of New York and elsewhere, ALAIN KALOYEROS, a/k/a "Dr. K," STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Section 1343 of Title 18, United States Code.

12.   It was a part and an object of the conspiracy that ALAIN KALOYEROS, a/k/a "Dr. K," STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, and others known and unknown, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, KALOYEROS, AIELLO, GERARDI, CIMINELLI, LAIPPLE, and SCHULER, and their co-conspirators, devised a scheme to defraud Fort Schuyler Management Corporation ("Fort Schuyler"), a State-funded entity charged with awarding significant taxpayer-funded development contracts, by representing to Fort Schuyler that the bidding process for those contracts was fair, open, and competitive, when, in truth and in fact, they secretly tailored the requests for proposals ("RFPs") for those contracts so that companies that were owned,

controlled, and managed by AIELLO, GERARDI, CIMINELLI, LAIPPLE, and SCHULER were guaranteed to win the contracts.

(Title 18, United States Code, Section 1349.)

## COUNT TEN

(Payments of Bribes and Gratuities - The Syracuse Developer RFP)

13.   From at least in or about 2013 to at least in or about 2015, in the Southern District of New York and elsewhere, STEVEN AIELLO and JOSEPH GERARDI, the defendants, willfully and knowingly did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization of a State government, and an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, AIELLO and GERARDI offered and gave bribes and gratuities to a representative of a New York State university and foundation in order to obtain a development contract.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT ELEVEN

(Payments of Bribes and Gratuities - The Buffalo Developer RFP)

14.   From at least in or about 2013 to at least in or about 2015, in the Southern District of New York and elsewhere, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, willfully and knowingly did corruptly give, offer, and agree to give a thing of value to a person, with intent to influence an agent of an organization of a State government, and an agency thereof, in connection with business, transactions, and series of transactions of such organization, government, and agency involving a thing of value of $5,000 and more, while such government and agency was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, CIMINELLI,

7

LAIPPLE, and SCHULER offered and gave bribes and gratuities to a representative of a New York State university and foundation in order to obtain a development contract.

(Title 18, United States Code, Sections 666(a)(2) and 2.)

## COUNT TWELVE

(False Statements to Federal Officers)

15.  On or about June 21, 2016, in the Southern District of New York and elsewhere, STEVEN AIELLO and JOSEPH GERARDI, the defendants, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive, legislative, and judicial branches of the Government of the United States, to wit, AIELLO and GERARDI, while meeting with federal agents and representatives of the United States Attorney's Office for the Southern District of New York, each made statements denying involvement in paying JOSEPH PERCOCO, a/k/a "Herb," the defendant, and in tailoring a request for proposal for the benefit of their company, when, in truth and in fact, AIELLO and GERARDI directed payments to PERCOCO and conspired to tailor a request for proposal for the benefit of their company.

(Title 18, United States Code, Section 1001(a)(2).)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

16.  I am a Criminal Investigator with the USAO, and I have been personally involved in the investigation of this matter, which has been handled by Special Agents of the Federal Bureau of Investigation, Buffalo Field Office ("FBI") and Criminal Investigators in the USAO. I have been employed by the USAO since 2015, prior to which I was a Revenue Agent with the Internal Revenue Service for more than twelve years. I and other members of the investigative team have experience in fraud and political corruption investigations and techniques associated with such investigations, including executing search warrants, financial analysis, and working with informants.

17.  This affidavit is based in part upon my own observations, my conversations with other law enforcement agents and others, my

8

examination of documents and reports by others, my interviews of witnesses, and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation. Where the contents of documents, including emails, and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where specifically indicated otherwise. For ease of reference, I have included a table of contents below.

## TABLE OF CONTENTS

I.   OVERVIEW ................................................. 11
II.  RELEVANT INDIVIDUALS AND ENTITIES ........................ 12
     A.  New York State Government and the Office of the
         Governor ............................................ 12
     B.  CNSE and Fort Schuyler .............................. 13
     C.  JOSEPH PERCOCO ...................................... 14
     D.  ALAIN KALOYEROS ..................................... 15
     E.  Todd Howe ........................................... 16
     F.  PETER GALBRAITH KELLY and the Energy Company ........ 17
     G.  STEVEN AIELLO, JOSEPH GERARDI, and the Syracuse
         Developer ........................................... 18
     H.  LOUIS CIMINELLI, MICHAEL LAIPPLE, KEVIN SCHULER, and
         the Buffalo Developer ............................... 19
III. THE PERCOCO BRIBERY SCHEME .............................. 20
     A.  The Energy Company Paid Bribes to PERCOCO in Exchange
         for Official Actions by PERCOCO ..................... 20
         i.    State Action Was Critical to the Energy Company ..... 21
         ii.   KELLY Began Providing Personal Benefits to PERCOCO .. 23
         iii.  PERCOCO Sought to Have His Wife Hired by the Energy
               Company ....................................... 26
         iv.   KELLY Caused the Energy Company to Make Payments to
               PERCOCO's Wife ................................ 29
         v.    PERCOCO Failed to Disclose Payments from the Energy
               Company ....................................... 32
         vi.   PERCOCO Agreed to Take Official Action for the Energy
               Company ....................................... 33

9

vii.  PERCOCO Helped the Energy Company Obtain the
      Reciprocity Agreement ............................... 34

viii. PERCOCO Took Official Action Regarding the PPA ...... 36

ix.   PERCOCO Extorted KELLY for More Money After Learning
      that the Energy Company Would Not Receive the PPA ... 39

x.    KELLY Stopped Payments to PERCOCO's Wife After It
      Became Apparent that the Energy Company Would Not
      Receive the PPA ..................................... 42

B.  The Syracuse Developer Paid Bribes to PERCOCO in
    Exchange for Official Action ........................... 43

    i.    PERCOCO Solicited Bribe Payments from the Syracuse
          Developer ....................................... 44

    ii.   The Syracuse Developer Wanted PERCOCO's Assistance
          with ESD ........................................ 47

    iii.  The Syracuse Developer Paid PERCOCO Approximately
          $35,000 ......................................... 49

    iv.   PERCOCO Pressured ESD to Reverse Its Decision on the
          Labor Peace Agreement ........................... 50

    v.    PERCOCO Assisted the Syracuse Developer in Obtaining
          the Release of State Funds ...................... 53

    vi.   PERCOCO Secured a Raise for AIELLO's Son ........... 56

IV.  THE BUFFALO BILLION FRAUD AND BRIBERY SCHEME ............. 58

A.  KALOYEROS Hired Howe to Be an Agent and Representative
    of CNSE ................................................ 59

B.  Executives of the Syracuse Developer and Buffalo
    Developer Bribed Howe for His Assistance in Obtaining
    State Contracts ........................................ 60

C.  Fort Schuyler Was Defrauded into Awarding State
    Development Contracts to the Syracuse Developer and the
    Buffalo Developer ...................................... 64

    i.    Fort Schuyler Issued RFPs for Preferred Developers for
          Syracuse and Buffalo ............................ 65

    ii.   The Syracuse RFP Was Designed to Defraud Fort
          Schuyler ........................................ 67

    iii.  The Buffalo RFP Was Designed to Defraud Fort
          Schuyler ........................................ 71

    iv.   Fort Schuyler Awarded Contracts to the Syracuse
          Developer and Buffalo Developer ................. 76

V.  FALSE STATEMENTS BY AIELLO AND GERARDI ................... 78

10

## I.   OVERVIEW

18.   The charges in this Complaint stem from two overlapping criminal schemes involving bribery, corruption, and fraud in the award of hundreds of millions of dollars in State contracts and other official State benefits.

19.   The first scheme (the "PERCOCO Bribery Scheme") involves efforts by JOSEPH PERCOCO, a/k/a "Herb," the defendant, who served as the Executive Deputy Secretary to the Governor of the State between in or about January 2012 and mid-2014, and again in or about 2015, to abuse his official position and extensive influence within the Executive Branch by seeking and accepting bribe payments from executives at companies that were seeking benefits and business from the State in exchange for use of PERCOCO's official authority and influence to benefit those companies.  In part to disguise the nature and source of the bribe payments, bribes to PERCOCO were funneled in certain instances through a third-party intermediary and in other instances through bank accounts and a shell company set up by Todd Howe ("Howe"), a consultant who had been retained by the bribe-paying companies to help them obtain official State favors, and who is now cooperating with the Government.

20.   More specifically, between 2012 and 2016, Howe arranged for more than $315,000 in bribe payments to JOSEPH PERCOCO, a/k/a "Herb," the defendant, and PERCOCO's wife, funded by two clients of Howe that were seeking substantial official State benefits at the time the payments were solicited and made:  an energy company (the "Energy Company") and a Syracuse-based real estate developer (the "Syracuse Developer").  PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, oversaw external affairs and government relations for the Energy Company.  KELLY arranged for PERCOCO and PERCOCO's wife to receive more than $287,000 in bribe payments from the Energy Company in exchange for PERCOCO's official assistance for the Energy Company on an as-needed basis, including helping the Energy Company obtain a State contract estimated to be worth $100 million, that would help finance a $900 million power plant in Wawayanda, New York, and assisting the Energy Company with obtaining millions of dollars in energy credits for a power plant it was building in New Jersey. STEVEN AIELLO and JOSEPH GERARDI, the defendants, were the President and the General Counsel, respectively, of the Syracuse Developer. AIELLO and GERARDI arranged for PERCOCO to receive approximately $35,000 in bribe payments in exchange for PERCOCO's official

assistance for the Syracuse Developer on an as-needed basis, including assisting the Syracuse Developer in reversing a costly decision of a State economic development agency, influencing the State to release payments owed to the Syracuse Developer, and obtaining a raise for AIELLO's son, a New York State employee who worked for PERCOCO.

21.    The second scheme (the "Buffalo Billion Fraud and Bribery Scheme") involves bribery, corruption, and fraud in the award of contracts under the Governor's "Buffalo Billion" initiative and similar programs.  In that scheme, executives at two companies, one of which was the Syracuse Developer, conspired with ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, and Howe to deceive Fort Schuyler, a State-funded entity charged with awarding State contracts worth hundreds of millions of dollars, by secretly rigging the bidding process so that the contracts would be awarded to those two companies.

22.    More specifically, ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, who oversaw the application process for many of the State grants awarded under the Buffalo Billion and similar programs, retained Howe to assist with developing the projects and identifying developers for those projects.  Howe in turn solicited and received bribe and gratuity payments from (a) the Syracuse Developer, run by, among others, STEVEN AIELLO and JOSEPH GERARDI, the defendants, who were seeking State development grants for projects in Syracuse, New York, and (b) a Buffalo-based developer (the "Buffalo Developer"), run by, among others, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, that was seeking State development grants for projects in Buffalo, New York.  In exchange for the bribe payments to Howe, Howe worked with KALOYEROS to deceive Fort Schuyler by secretly tailoring the required qualifications for those development deals so that the Syracuse Developer and the Buffalo Developer would be awarded the contracts, in Syracuse and Buffalo respectively, without any meaningful competition.

## II.    RELEVANT INDIVIDUALS AND ENTITIES

### A. *New York State Government and the Office of the Governor*

23.    According to public sources and information provided by the Governor's Office, I know the following: the State's executive branch is headed by the Governor, who serves as the State's chief executive, managing various State agencies, including those charged with overseeing economic development, environmental conservation,

transportation and energy.  The Governor's closest advisors and aides are referred to as working in the "Executive Chamber."  The Executive Chamber includes the following officials, among others: Executive Deputy Secretary, which is the position that was held by JOSEPH PERCOCO, a/k/a "Herb," the defendant, as described below; Secretary to the Governor; and Director of State Operations.  The Secretary to the Governor is in charge of the Executive Chamber's overall management.  The Director of State Operations oversees the day-to-day functioning of State government, including overseeing and providing direction to many of the State agencies.  Within the Executive Chamber there are also various Deputy and Assistant Secretaries organized by subject area, who are the primary liaisons with their respective State agencies, and report up to the Director of State Operations.

24.  I know from publicly available federal and State government documents and public reports that, in each year relevant to this Complaint, the government of the State received funds from the federal government in excess of $10,000 per year.

## B. *CNSE and Fort Schuyler*

25.  Based on public information and interviews with, among others, individuals associated with the College of Nanoscale Science and Engineering ("CNSE") and its affiliated entities, I learned the following:

a.  CNSE is a public institution of higher education that is funded in part by the State.  In or around September 2014, CNSE merged with the State University of New York Institute of Technology to become a new public university known as the SUNY Polytechnic Institute ("SUNY Poly"), of which CNSE is now a part.  Because CNSE became part of SUNY Poly during the time period relevant to this Complaint, unless otherwise specified, I refer to both CNSE and SUNY Poly as "CNSE" in this Complaint. SUNY Poly is part of the State University of New York, which is a public, State-supported organization.

b.  The head of CNSE and SUNY Poly at all times relevant to this Complaint was ALAIN KALOYEROS, a/k/a "Dr. K," the defendant. Under his leadership, CNSE, and later SUNY Poly, focused on developing partnerships with private companies to create large development and construction projects.  When the Governor's Buffalo Billion initiative was announced in 2012, CNSE created projects in

Buffalo and Syracuse, New York, in order to take advantage of new State funds committed to development in upstate New York.

c.    In or around 2009, CNSE created Fort Schuyler as an affiliated non-profit real estate corporation to partner with private companies on CNSE's behalf to carry out its development projects.  As relevant here, Fort Schuyler manages development and construction projects associated with CNSE in Buffalo and Syracuse, New York.  Fort Schuyler is governed by a Board of Directors, which, among other things, is charged with selecting private companies to partner with Fort Schuyler in CNSE-related development projects, including Buffalo Billion-related projects in Buffalo and similar development projects in Syracuse, among other places.  Certain public funding for CNSE goes through the Research Foundation for the State University of New York (the "Research Foundation"), which employed many individuals associated with CNSE and Fort Schuyler, including ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, and Howe (as a retained consultant), during the times relevant to this Complaint.  During each year relevant to this Complaint, the Research Foundation received more than $10,000 in federal funding.

### C. *JOSEPH PERCOCO*

26.    Based on my review of documents both publicly available and obtained during this investigation, including electronic communications to and from JOSEPH PERCOCO, a/k/a "Herb," the defendant, and my interviews with Howe as well as several individuals who worked at the Governor's Office at the relevant times, I learned that:

a.    In or around 1992, PERCOCO joined the Office of the then-Governor of New York (the "Former Governor") as an intern. PERCOCO later worked for the current Governor (the son of the Former Governor) when the Governor was Attorney General.  In or about January 2011, PERCOCO was appointed to be the Executive Deputy Secretary to the Governor, and remained one of the Governor's closest advisors during the Governor's first and second terms.  The position of Executive Deputy Secretary is a high-ranking, senior, and influential part of the Governor's Executive staff.  PERCOCO was generally seen as the Governor's "right-hand man," who coordinated access to the Governor and often spoke for him on a broad array of substantive and administrative matters. PERCOCO's role included serving as a primary "gatekeeper" of opportunities to speak or meet with the Governor,

14

overseeing logistics of the Governor's events and travel, supervising appointments and administrative matters for the Executive Chamber, and playing the principal role in organizing support for the Governor's initiatives among lawmakers, labor leaders, and other constituencies.  During all times relevant to this Complaint, PERCOCO's primary work location was in Manhattan, New York, although he typically traveled to Albany, New York approximately several times per month and was an almost constant presence with the Governor during his official duties.  PERCOCO also maintained a very close, personal relationship with the Governor and the Former Governor, exhibited by the Governor's public reference to PERCOCO as the Former Governor's "third son."

     b.    On or about April 21, 2014, PERCOCO officially left New York State employment to serve as campaign manager for the Governor's reelection campaign, and returned to State service on or about December 8, 2014.  PERCOCO permanently left his position as Executive Deputy Secretary in or about January 2016, and is currently an executive in the private sector.

     c.    According to multiple witnesses interviewed in this investigation, as well as PERCOCO's email communications at the relevant time, although PERCOCO was not on the State payroll between at least on or about April 22, 2014 and December 7, 2014, while he was the manager of the Governor's reelection campaign, PERCOCO nevertheless continued to function in a senior advisory and supervisory role with regard to the Governor's Office during that time period, and continued to be involved in the hiring of staff and the coordination of the Governor's official events and priorities, among other things, and to travel with the Governor on official business.  In addition, PERCOCO represented to others that he intended to return to State service, including by stating on a mortgage application submitted on or about August 7, 2014, that he was "guaranteed a position with [the Governor] after the November election."

### D. *ALAIN KALOYEROS*

27.  I have learned from emails, financial records, publicly available information, and witness interviews, including interviews with Howe and executives of CNSE and its affiliated entities, that:

a.   ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, currently serves as the President of SUNY Poly.   Prior to CNSE's merger into SUNY Poly, KALOYEROS served as Senior Vice President and Chief Executive Officer of CNSE.

b.   At all relevant times, KALOYEROS served as a member of the Board of Directors of Fort Schuyler.   Fort Schuyler's officers also were hired by KALOYEROS and relied on staffing from the Research Foundation, and KALOYEROS supervised and controlled Fort Schuyler's day-to-day operations.

### E. *Todd Howe*

28.   I know from witness interviews, including interviews with Howe, and the review of emails, financial records and publicly available information that:

a.   Howe has held several public positions, including as a strategic advisor to the Governor when the Governor was United States Secretary of Housing and Urban Development, and as a senior aide to the Former Governor when the Former Governor was Governor of New York. I also know that Howe has known JOSEPH PERCOCO, a/k/a "Herb," the defendant, since PERCOCO was a college student, when Howe hired PERCOCO to work for the Former Governor.

b.   During all times relevant to this Complaint, Howe was the president and primary employee of a government relations and lobbying firm (the "Government Relations Firm") located in Washington, DC, that was a subsidiary of a law firm located in Albany, New York (the "Law Firm").   The co-chair of the Law Firm controlled the finances of the Government Relations Firm, including Howe's salary and bonuses, and approved all retention agreements for new clients of the Government Relations Firm.   Also during all times relevant to this Complaint, Howe was retained by several clients, most, if not all, of which retained Howe for his contacts with State officials, and for which Howe provided assistance with obtaining or facilitating business before the State.   Howe's clients included the Energy Company, the Syracuse Developer, and the Buffalo Developer.

c.   During all times relevant to this Complaint, Howe was also retained as a consultant to CNSE.   In his role as a consultant for CNSE, Howe maintained an office and parking space at CNSE, served

16

as a close advisor to ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, acted as an agent of CNSE with respect to, among other things, CNSE's development projects, including large, state-funded development projects in Syracuse and Buffalo, New York, and served as CNSE's primary liaison to the Governor and the Governor's senior staff.

d.   In or around June 2016, Howe began meeting with the Government and cooperating with the Government's investigation.   In those meetings, Howe admitted to his role in the illegal schemes set forth herein as well as other crimes.   In or about September 2016, Howe pleaded guilty pursuant to a cooperation agreement with the Government to several federal crimes, including conspiracies to commit honest services fraud, extortion under color of official right, bribery, and wire fraud, substantive extortion and wire fraud offenses, and tax fraud.   The information provided by Howe has been corroborated by contemporaneous documents, including emails, and by the statements of other witnesses.

### F. *PETER GALBRAITH KELLY and the Energy Company*

29.   I have learned from my review of emails, financial records, publicly available information, and witness interviews, including interviews with Howe and with employees of the Energy Company, that:

a.   The Energy Company is a privately-owned electric power generation development and asset management company that, according to its website, focuses on a clean energy strategy utilizing natural gas and wind-powered generation.   Since in or about 2008, the Energy Company has been working to develop a $900 million power plant (the "Power Plant") in Wawayanda, New York, currently under construction.   As set forth in more detail below, the development process for the Power Plant involved numerous State approvals.

b.   Since in or about 2008, PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, has been the Senior Vice President of External Affairs at the Energy Company.   In that role, which he continues to hold, he oversees public relations and governmental affairs for the Energy Company, in particular as it relates to the building of new power plants across the United States.

17

## G. *STEVEN AIELLO, JOSEPH GERARDI, and the Syracuse Developer*

30.   I have learned from emails, financial records, publicly available information, and witness interviews, including interviews with Howe, that:

a.   The Syracuse Developer is a large real estate development firm located in Syracuse, New York that, through various corporate affiliates, builds, owns, and manages real estate in and around New York State.  Prior to 2013, the Syracuse Developer's business focused primarily on private development opportunities, including strip malls and supermarkets.  Beginning in or about 2013, the Syracuse Developer began obtaining a significant portion of its business from State-funded construction contracts.  Specifically, in or around December 2013, the Syracuse Developer was awarded a contract with Fort Schuyler to serve as the preferred developer for projects of CNSE to be created in Syracuse, New York.  This award permitted the Syracuse Developer to be chosen for CNSE development projects of any size in or around Syracuse without further competitive bidding, and, indeed, shortly thereafter, the Syracuse Developer received a contract worth approximately $15 million to build a film studio in Syracuse, New York, associated with CNSE, and in or around October 2015, the Syracuse Developer received a contract worth approximately $90 million to build a manufacturing plant in Syracuse, New York, associated with CNSE.

b.   STEVEN AIELLO, the defendant, is a founder of the Syracuse Developer and has been its President since in or about 1998.  Among other responsibilities, AIELLO serves as the company's general manager, focusing on business development, negotiating real estate contracts and handling tenant negotiations.

c.   JOSEPH GERARDI, the defendant, is a founder of the Syracuse Developer and its General Counsel since in or about 1998.  Among other responsibilities, GERARDI is responsible for, among other things, public permitting and negotiating company contracts.

## H. *LOUIS CIMINELLI, MICHAEL LAIPPLE, KEVIN SCHULER, and the Buffalo Developer*

31.  I have learned from emails, financial records, publicly available information, and witness interviews, including interviews with Howe, that:

a.   The Buffalo Developer is a large Buffalo-based construction and development company that provides, among other things, construction management and general contracting services. As relevant to this Complaint, in or around January 2014, the Buffalo Developer was named by Fort Schuyler as a preferred developer for projects of CNSE to be created in Buffalo, New York.  This award permitted the Buffalo Developer to be chosen for CNSE development projects of any size in or around Buffalo without further competitive bidding, and, indeed, in or around March 2014, as a result of its position as a preferred developer, the Buffalo Developer received a contract worth approximately $225 million to build a manufacturing plant in Buffalo, New York, associated with CNSE.  That contract ultimately expanded to be worth approximately $750 million.

b.   LOUIS CIMINELLI, the defendant, is the Chairman and CEO of the Buffalo Developer, and served in that role at all times relevant to this Complaint.  In that role, CIMINELLI directs the Buffalo Developer's long-term strategy and develops strategic partnerships in the State and elsewhere.

c.   MICHAEL LAIPPLE, the defendant, is the President of a division of the Buffalo Developer that focuses, among other things, on initiatives involving public-private infrastructure projects, and served in that role at all times relevant to this Complaint.  In this role, LAIPPLE works on, among other things, developing partnerships between the Buffalo Developer and public entities for large-scale developments.

d.   KEVIN SCHULER, the defendant, is a Senior Vice President for the Buffalo Developer, and served in that role at all times relevant to this Complaint.  SCHULER is responsible for, among other things, the Buffalo Developer's external communications, government affairs, and community and media relations.

III.   **THE PERCOCO BRIBERY SCHEME**

A. *The Energy Company Paid Bribes to PERCOCO in Exchange for Official Actions by PERCOCO*

32.   As set forth in detail below, based on my review of emails, documents obtained in course of this investigation, and financial records, and interviews with, among others, Howe and current and former State employees and employees of the Energy Company, I believe that JOSEPH PERCOCO, a/k/a "Herb," and PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendants, and Howe engaged in a multi-year bribery scheme whereby KELLY caused the Energy Company to make secret payments to PERCOCO through PERCOCO's wife in exchange for PERCOCO's official assistance to the Energy Company.  The evidence shows that: (a) State action was critical to the Energy Company's business; (b) starting as early as 2010, KELLY provided personal benefits to PERCOCO in an effort to cultivate access to PERCOCO; (c) in response to KELLY's requests for official assistance, PERCOCO requested that the Energy Company hire his wife; (d) in or around the end of 2012, KELLY caused the Energy Company to create a position for PERCOCO's wife; and (e) in exchange for various personal benefits from KELLY as well as payments of approximately $90,000 per year ($7,500 per month) from the Energy Company to PERCOCO and his wife, PERCOCO agreed to use his official position and influence, and did in fact use his official position and influence, to help the Energy Company with specific State matters as the opportunities arose.  Among other things, PERCOCO agreed to use his official position and influence to assist the Energy Company's efforts to obtain (i) a valuable agreement from the State allowing the Energy Company to buy lower-cost emissions credits in New York for a power plant proposed to be built in New Jersey (the "Reciprocity Agreement") and (ii) a lucrative long-term power purchase agreement with the State guaranteeing a buyer for the power to be produced at a power plant proposed to be built in New York (the "PPA").

33.   Furthermore, as explained in detail below, based on my review of emails, documents obtained in course of this investigation, and financial records and interviews of, among others, Howe and current and former State employees, I believe that JOSEPH PERCOCO, a/k/a "Herb," the defendant, and Howe continued to extort monetary payments from PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, and the Energy Company even after it became clear to PERCOCO and Howe in or around the end of 2013 that the State would not award

a PPA to the Energy Company.  PERCOCO and Howe did not inform KELLY that they understood from State officials that the Energy Company would not be receiving a PPA.  To the contrary, PERCOCO continued to promise official actions and influence related to the PPA in order to ensure that KELLY and the Energy Company continued to employ and pay PERCOCO's wife.

### i.   State Action Was Critical to the Energy Company

34.   Based on my review of emails, Energy Company documents, and public information, I learned that the Energy Company's business has depended significantly on its success in obtaining State regulatory approvals, contracts, and agreements.  For example, the Energy Company's Power Plant project, budgeted to cost approximately $900 million, required numerous State regulatory approvals, including from the Department of Public Service ("DPS"), Department of Environmental Conservation ("DEC") and Department of Transportation ("DOT").  Beginning at least in or about mid-2010, the Energy Company was seeking to obtain a PPA, under which the State would purchase virtually all power produced by the Power Plant for up to 15 years, guaranteeing a significant and long-term stream of income for the Power Plant.  Based on internal Energy Company projections, obtaining a PPA was worth at least approximately $100 million to the Energy Company, and would significantly assist the Energy Company in obtaining financing for the project.  In or around 2012, the Energy Company began actively seeking to apply for and obtain a PPA offered through DPS and the New York Power Authority ("NYPA").

35.   Based on my review of emails, Energy Company documents, and public information, and on interviews with, among others, Howe and employees of the Energy Company, I learned the following:

a.   As of mid-2010, the Energy Company had retained the Law Firm and Howe to provide consulting advice with respect to regulatory approvals related to the Energy Company's Power Plant project.  Pursuant to its arrangement with Howe, the Energy Company made regular payments to the Law Firm, a portion of which were paid to Howe through the Government Relations Firm, the D.C.-based lobbying firm associated with the Albany Law Firm.  In or about that time, however, PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, sought to have the Energy Company make additional payments directly to Howe.  Howe understood, based on his conversations with KELLY, that KELLY wanted to make additional payments to Howe in order to increase

KELLY's access to the Governor (who was expected to be elected in the coming months) and certain of the Governor's advisors, including JOSEPH PERCOCO, a/k/a "Herb," the defendant, in order to secure a PPA for the Energy Company.  In consultation with KELLY, Howe set up a limited liability company ("Howe's LLC") that had no business purpose other than to conceal the source and receipt of payments made to or through Howe.  Howe then used his LLC to conceal from his principal employer, the Government Relations Firm, additional payments made to Howe from the Energy Company.

b.    Between August 2010 and April 2015, the Energy Company paid Howe's LLC approximately $474,000.  Because Howe accepted these payments outside of his employment agreement with the Government Relations Firm, KELLY agreed with Howe not to tell anyone at the Government Relations Firm or the Law Firm about the additional payments to Howe's LLC.  During that same period, the Energy Company paid the Government Relations Firm approximately $332,062.

36.   Based on my review of emails, Energy Company documents, and public information, and on interviews with, among others, Howe, State officials, and employees of the Energy Company, I learned that PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, understood that JOSEPH PERCOCO, a/k/a "Herb," the defendant, and an individual who worked closely with PERCOCO in the Executive Chamber from 2011 through in or around June 2014, in the position of State Operations Director (referred to herein as the "Former State Operations Director"), had the ability to influence the development of the Power Plant given their senior roles with respect to the Governor, and their respective roles overseeing State operations and the functioning of key agencies such as DEC, DOT, DPS and NYPA, and liaising with labor unions.  Ultimately, and as set out in greater detail below, KELLY sought to have PERCOCO use his official position and influence with respect to at least the following State decisions and actions:

a.    As early as 2010, Howe began to seek PERCOCO's assistance in influencing the Former State Operations Director with respect to the Power Plant, most specifically by asking PERCOCO to advise the Former State Operations Director that the Power Plant was supported by labor unions and to advocate for the closing of a nuclear power plant located in Westchester County, New York (the "Nuclear Power Plant").  Based on my review of publicly available documents and my interviews of witnesses, including employees of the Energy Company, the importance of the Power Plant to the State depended,

at least in part, on whether the Nuclear Power Plant was going to be shut down.

b.      Beginning in or about 2011, after the Governor's election, KELLY sought information and assistance regarding the process through which the Energy Company could apply for a long-term PPA, something the Energy Company believed would be of great economic benefit because it would guarantee a steady and significant stream of income for the Power Plant and assist the Energy Company in securing financing to build the Power Plant.

c.      In or about early 2012, the Governor announced in his State of the State address the creation of an "Energy Highway Initiative," which included the appointment of an interagency task force to focus on increasing New York's energy generation and transmission capacity.  In connection with this initiative, in or about April 2012, NYPA issued a request for information (the "Energy RFI"), seeking information on potential energy generation projects. On or about May 30, 2012, the Energy Company submitted a response to the Energy RFI, highlighting its efforts to build the Power Plant.

d.      In or about April 2013, NYPA issued a request for proposals for energy transmission projects and for the construction of new power plants.  NYPA further offered a PPA to any selected new power plant.  On or about May 20, 2013, the Energy Company filed its response seeking the PPA.

e.      In or around August 2013, the Energy Company sought a valuable agreement between a New Jersey state agency and the New York State DEC (the "Reciprocity Agreement") which would allow the Energy Company to purchase emissions credits -- which are required to offset certain types of pollution created by power plants -- in New York in connection with a power plant being built by the Energy Company in New Jersey.  The absence of a Reciprocity Agreement would have made it difficult, if not impossible, for the Energy Company to construct the New Jersey power plant.

## ii.   KELLY Began Providing Personal Benefits to PERCOCO

37.   Based on my review of emails between and among PETER GALBRAITH KELLY, JR., a/k/a "Braith," and JOSEPH PERCOCO, a/k/a "Herb," the defendants, and Howe, and Energy Company expense records, I know that KELLY began to offer and provide certain benefits to JOSEPH

23

PERCOCO, a/k/a "Herb," the defendant, in late 2010 and 2011, in an effort to ingratiate himself to PERCOCO.  Examples of these interactions include the following:

        a.   In or around August 2010, KELLY took PERCOCO, Howe and others on a weekend fishing trip in Montauk, New York, paid for by the Energy Company.  In connection with the trip, KELLY submitted a reimbursement request for approximately $2,748 in "business development" expenses connected to the Power Plant, which did not reflect that PERCOCO was on the fishing trip.

        b.   On or about October 27, 2010, KELLY arranged, at PERCOCO's request, for the Energy Company to donate a private jet to transport the Governor and his staff to campaign events later that same week.

        c.   KELLY took PERCOCO and Howe to a $279 lunch at a steak restaurant in Manhattan, on or about December 23, 2010, just a few days before the Governor took office for the first time, and charged the meal to the Energy Company, under a billing code for the Power Plant.

        d.   On or about February 4, 2011, KELLY invited PERCOCO fishing again and stated in an email, "just know whenever YOU need me I'm in."[1]

---

[1] To the extent emails to or from PERCOCO are referenced herein, the emails were sent to or from PERCOCO's personal email address, and not his New York State email address, and, as is true with all documents referenced herein, were obtained pursuant to judicially authorized search warrants, in response to grand jury subpoenas to third parties, or through voluntary disclosures from third parties. Based on my review of policies and advisory opinions issued by the State Office of Information Technology Services and State Committee on Open Government, I learned that State employees are not to use personal email addresses to conduct State business unless explicitly authorized, and that emails received or sent by a State official in his or her capacity as an official are records subject to disclosure pursuant to the New York Freedom of Information Law regardless of whether those emails are sent or received from an official or personal

38.   Based on emails and interviews with, among others, Howe, I know that, by at least the spring of 2011, PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, was actively seeking the assistance of JOSEPH PERCOCO, a/k/a "Herb," the defendant, with obtaining State support for the development of the Power Plant, and PERCOCO began to use his influence to assist the development of the Power Plant.

a.   On or about May 16, 2011, Howe reported to KELLY that PERCOCO is "all over" the Power Plant project and wanted to set up a meeting with the Former State Operations Director to discuss the project. Howe further reported to KELLY that there was "No opinion yet . . . JP doing something with this though." KELLY responded, "I got an email from Joe as well saying just that." Based on my conversations with Howe, I understand that the "opinion" referred to in this email is the opinion of senior members of the Governor's staff, including the Former State Operations Director, with respect to supporting the development of the Power Plant.

b.   On or about June 5, 2011, the Former State Operations Director sent an email from his personal email address to Howe that stated that the "project" -- i.e., the development of the Power Plant -- faced a lot of challenges, including the need for a PPA, low energy prices given a "supply glut in NY State," and stiff competition from other potential projects. That same day, Howe wrote to PERCOCO that he had spoken to the Former State Operations Director regarding the Energy Company and that the Former State Operations Director was "good but need u now."

c.   On or about June 7, 2011, Howe advised KELLY by email that Howe had arranged a meeting for KELLY with the Former State Operations Director on or about June 9, 2011. In an email on the same day as the meeting, June 9, 2011, Howe stated to PERCOCO: "Herb, do the right thing with Braith..this goes south herb, you will have to

---

email address. Nonetheless, I am aware of media reports of State employees using personal email addresses to avoid disclosure of records under the New York Freedom of Information Law.

clean out the 'herb cave' downstairs at the estate as I'll have to move in!!!"[2] I understand that, in this email, Howe is reminding PERCOCO what a financially important client the Energy Company was to Howe. PERCOCO responded, "U got it herb. Thx."

      d.   On the day of the meeting, on or about June 9, 2011, Howe instructed KELLY to "go see Percoco after [Former State Operations Director] meeting [. . .] Wait if necessary." KELLY replied, "I'll sleep in the streets of NYC waiting for JP if I need to." Howe has explained that "JP" is PERCOCO.

### iii.   PERCOCO Sought to Have His Wife Hired by the Energy Company

      39.   As set forth above, in or around May 2012, the Energy Company responded to the Energy RFI with a submission that sought to convince State officials of the Power Plant's importance to energy generation in the State. Based on emails and financial records of JOSEPH PERCOCO, a/k/a "Herb," the defendant, and my conversations with Howe, I know that at or around the same time, PERCOCO was facing significant financial difficulties and was struggling to pay his bills. In or about July 2012, PERCOCO and his wife purchased a home in Westchester County, New York, for approximately $800,000. In or about September 2012, PERCOCO's wife took a one-year unpaid leave of absence from her job as a public school teacher in a New York City school, which she resigned from the following year. Based on my review of financial analysis conducted by the FBI, which reviewed financial records pertaining to the PERCOCOs, I learned that after PERCOCO's wife left her job in September 2012, the PERCOCOs' average monthly income decreased from approximately $12,714 to approximately $8,594. At that time, their monthly expenses, which totaled at least approximately $20,000 per month, far exceeded their income, and their

---

    [2] Based on my review of emails in this investigation, and the interview of witnesses, including Howe, I learned that "Herb" is a name PERCOCO, Howe, the Former State Operations Director, and at least one other government official have used as a term of endearment to refer to each other since in or around the time that the Former Governor was in office. Separately, I also learned that Howe and others often referred to KELLY as "Braith," short for KELLY's middle name, GALBRAITH.

savings was close to being depleted.  Between in or about May and October 2012, PERCOCO attempted -- unsuccessfully -- to assist his wife in obtaining a substitute teaching job near their new home in Westchester County.

40.  Based on my review of emails and my discussion with Howe, I learned that in the spring of 2012 -- at or around the same time the Energy Company submitted its response to the Energy RFI -- JOSEPH PERCOCO, a/k/a "Herb," the defendant, asked PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, to have the Energy Company hire his (PERCOCO's) wife.  Indeed, according to Howe, from in or about the spring of 2012 until in or about November 2012, PERCOCO continually pressured Howe and KELLY to provide PERCOCO's wife a job with the Energy Company.  My review of emails during this time period confirms and corroborates the pressure brought to bear by PERCOCO.  For example:

a.  On or about May 31, 2012, after KELLY sought "feedback" from Howe on the Energy Company's proposed response to the Energy RFI, Howe wrote to KELLY, "Spoke to Joe.  He's calling you possibly tomorrow on wife issue."  Howe further noted, in the same email, that he had spoken to the Former State Operations Director, who "said 87 [Energy RFI responses] came in."  I know from publicly available information that the State received approximately 85 responses to the Energy RFI, including the response from the Energy Company.

b.  On or about September 11, 2012, PERCOCO wrote an email to Howe stating, "Herb: Nail down that issue. Happy to have dinner or meet with you guys anytime! Thanks."  According to Howe, "nail down that issue," referred to finding a job for PERCOCO's wife.  Howe forwarded the email to KELLY, and stated: "Braith need to talk."

c.  On or about September 18, 2012, Howe wrote an email to KELLY suggesting a dinner for Howe, "jp," (i.e., PERCOCO) and KELLY the following week.  In the same email chain, Howe suggested KELLY and Howe talk the next day, "Need to try and hammer something out for jp.  Wants you and I to try and identify something he wants to try and stay removed if possible if u know what I mean."  Howe understood that PERCOCO wanted to "stay removed" because it was improper for PERCOCO to be asking KELLY for a job for his wife given the work PERCOCO had done and was doing to advocate for the Power

Plant.  Howe further understood that PERCOCO did not want others to
know that he was asking the Energy Company for a job for his wife.

     d.     Based on my review of emails, KELLY's business expense
records and cellular phone records noting the location of calls made
by Howe and PERCOCO, and discussions with Howe, I learned that, on
or about September 26, 2012, PERCOCO, KELLY, and Howe had dinner at
a restaurant in Danbury, Connecticut.  According to Howe, during
dinner, PERCOCO, KELLY and Howe discussed, among other things, the
Energy Company hiring PERCOCO's wife and the Energy Company obtaining
a PPA.  KELLY agreed at this dinner that he would work on finding a
job at the Energy Company for PERCOCO's wife.  KELLY charged this
dinner, which cost approximately $386.00, to the Energy Company's
budget for the Power Plant, according to a reimbursement request from
KELLY that was approved by the Energy Company.  The reimbursement
request further noted that the meal was with Howe, but made no
reference to PERCOCO.

     41.   Based on my interview of the then-President of the Energy
Company ("Executive-1"), I learned that, in or about October 2012,
PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, met with
Executive-1 and the then-CEO of the Energy Company to advise them
that KELLY wanted to hire the wife of JOSEPH PERCOCO, a/k/a "Herb,"
the defendant, to work on a community education project that KELLY
was planning to develop.  Executive-1 and the then-CEO expressed
concern about hiring the wife of a senior member of the Governor's
staff while the Energy Company was seeking extensive regulatory review
of its Power Plant before State agencies, and directed KELLY to obtain
an ethics opinion or approval from the Governor's Office before
proceeding.  KELLY later advised them that he had obtained, in sum
and substance, an ethics opinion from the Governor's Office approving
the Energy Company's hiring of PERCOCO's wife.  Based on my review
of documents provided by the Governor's Office and the Energy Company,
and interviews of Executive-1 and attorneys for the Executive Chamber,
I learned that no such ethics opinion was ever provided to the Energy
Company and there is no evidence to suggest that one was ever sought
or prepared.

     42.   Emails in or around the fall of 2012 reflect continued
pressure by JOSEPH PERCOCO, a/k/a "Herb," the defendant, to finalize
the hiring of his wife by the Energy Company.  For example, on or about
November 12, 2012, PERCOCO wrote to Howe stating, "Herb: need to pull
the trigger here.  things getting bad.  What do you think about this

Thursday at my house?"  Howe has explained that he understood "things getting bad" to refer to PERCOCO's financial situation at the time.

        a.   In a follow-up email, Howe confirmed, "Fat boy locked and loaded.. 7Thursday night at the estate."  PERCOCO replied, "is he bringing the check?? LOL."  Based on my interviews of Howe and my review of emails in this investigation, I know that Howe and PERCOCO often referred to KELLY as "Fat Man," or "Fat Boy."  Howe later wrote, "herb -- need 7500 boxes of zitti!!"  PERCOCO responded, "yes 7500/month is her old salary."[3]

        b.   Howe has explained that "zitti" or "ziti" was a code word he and PERCOCO used for money, which PERCOCO came up with based on the use of the term in the television show "The Sopranos."

**iv.   KELLY Caused the Energy Company to Make Payments to PERCOCO's Wife**

        43.   As set forth herein, I believe, based on emails, documents obtained in the course of this investigation, financial records, and interviews with, among others, Howe and employees of the Energy Company, that in or about November 2012, JOSEPH PERCOCO, a/k/a "Herb," and PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendants, reached an agreement under which the Energy Company would employ and make payments to PERCOCO's wife and, in exchange, PERCOCO agreed to use, and did in fact use, his official position and influence to assist the Energy Company with State actions as opportunities arose.  To carry out his end of this agreement, KELLY (a) caused the Energy Company to create a previously non-existent job for PERCOCO's wife; (b) ran payments to the PERCOCOs of approximately $7,500 per month through a consultant who worked for the Energy Company ("Consultant-1") in order to disguise the source of the payments, and also took additional steps to conceal PERCOCO's wife's employment at the Energy Company; (c) paid PERCOCO's wife a much higher salary than warranted by her limited work; and (d) falsely told his superiors at the Energy Company (on two occasions) that PERCOCO had obtained an ethics opinion from the Governor's Office approving of PERCOCO's

_____

3 Based on my review of Department of Education records, PERCOCO's wife annual salary during the 2011-2012 school year was approximately $75,796.

wife's employment with the Energy Company.  Moreover, when recently questioned by federal agents about his arrangement with PERCOCO, KELLY made false statements about the purpose of making payments through Consultant-1 in an apparent effort to conceal the criminal nature of his conduct.  For his part, PERCOCO further concealed the criminal scheme by failing to include the Energy Company as the source of payments on his State-mandated financial disclosure forms.

44.   Evidence of the nature of the job created for the wife of JOSEPH PERCOCO, a/k/a "Herb," the defendant, and of the efforts of PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, and PERCOCO to conceal the payments made by the Energy Company includes the following:

a.   Based on my review of emails, documents obtained in the course of this investigation, financial records, and interviews with, among others, Howe and employees of the Energy Company, I know that, in or around fall 2012, after KELLY learned that PERCOCO wanted to find a job for his wife, KELLY and others he supervised began developing an education program targeted at fourth grade students located in and around a power plant the Energy Company was building in New Jersey (the "Education Program").  Based on an interview of Executive-1, I learned that this was the first time the Energy Company developed an education program for elementary school students in connection with the development of one of its power plants, and that Executive-1 was not aware of any particular issue, either during mid to late 2012 or at or around the New Jersey location, that necessitated such a program.

b.   Based on my review of financial records and interviews with employees of the Energy Company, I know that the Energy Company began making monthly payments of approximately $7,500 to the wife of PERCOCO on or about December 18, 2012.  On or about December 6, 2012, Howe advised PERCOCO that the payments would begin shortly: "Herb. with bk in dc.  Ziti gets cleared on 15 th When all the boxes are signed arrives in ur mailbox 2 or 3 days later."  Howe has explained that "bk" refers to KELLY.

c.   Based on my review of emails, documents obtained in the course of this investigation, financial records, and interviews with, among others, Howe, and employees of the Energy Company, I

30

believe that PERCOCO and KELLY deliberately tried to conceal the fact
that the Energy Company was the source of these payments, as follows:

    i.   Throughout PERCOCO's wife's tenure with the
Education Program, the Energy Company used Consultant-1 as a
pass-through for its monthly payments to PERCOCO's wife. Between
December 2012 and January 2016, PERCOCO's wife received a monthly
check of approximately $7,500 from Consultant-1. During each of
these months, shortly before each payment to PERCOCO's wife,
Consultant-1 received a payment from the Energy Company to cover the
amount to be paid to PERCOCO's wife.

    ii.  Based on interviews with Consultant-1 and other
employees of the Energy Company, I learned that Consultant-1 did not
hire or supervise PERCOCO's wife. Consultant-1 stated that, in or
about fall 2012, he was told by KELLY that payments to PERCOCO's wife
would be made through Consultant-1. KELLY provided two reasons for
this payment structure: (i) it purportedly was more convenient for
billing purposes; and (ii) there would be negative "optics" of hiring
the wife of a senior official in State government while the Energy
Company had business before the State.

    iii.  Based on an interview with an external affairs
manager at the Energy Company (the "External Affairs Manager"), who
has worked for KELLY since in or about 2010, I learned that, based
on conversations the External Affairs Manager had with KELLY and
others in the External Affairs team, the External Affairs Manager
purposefully kept PERCOCO's wife's last name out of brochures for
the Education Program, directed PERCOCO's wife to refer to herself
by her first name when in classrooms, and purposefully kept PERCOCO's
wife out of any pictures used to promote the program.

    d.  Based on my review of emails and interviews with
employees of the Energy Company, I believe that the hours worked by
PERCOCO's wife did not come close to justifying the $7,500 per month
salary she was receiving. Between in or around December 2012 and April
2014, during which time the Education Program was being developed,
PERCOCO's wife worked no more than 15 hours per month assisting with
the development of the curriculum and participating in calls. Once
PERCOCO's wife began teaching in classrooms in or around April 2014,
she worked approximately 16 to 25 hours per month during the school
year, primarily teaching partial-day courses to fourth graders once

or occasionally twice per week. During the summer, when school was not in session, PERCOCO's wife worked approximately ten hours per month, and sometimes as little as two to three hours per month, on special projects assigned by the External Affairs Manager. PERCOCO's wife was paid $7,500 per month regardless of the number of hours she worked, and was paid approximately three and a half times more than another employee at the Education Program, who worked more hours per week.

        e.    Based on my review of Energy Company documents and interviews of three Energy Company executives, including Executive-1, I learned that, in or around June and July 2014, KELLY, for the second time, falsely claimed to have an ethics opinion authorizing the Energy Company's hiring of PERCOCO's wife. This false representation was made in response to questions raised by two executives of the Energy Company after they noticed a substantial invoice from Consultant-1 in or around June 2014. On or about July 2, 2014, in a meeting with those executives and the then-CEO of the Energy Company, KELLY stated, in sum and substance, that PERCOCO's wife was being paid through Consultant-1 but her name could not appear on Consultant-1's invoices because of who she was, i.e., the wife of a high-level State official. In the same meeting, KELLY stated -- falsely -- that there was an ethics opinion from the Governor's Office approving the arrangement, and that he had seen such opinion, but he did not have a copy. KELLY further (falsely) stated that lawyers had reviewed the arrangement and there was "nothing illegal about it." Although KELLY was asked to provide additional information about the purported approvals from the Governor's Office after the meeting, KELLY never did so.

        f.    KELLY was voluntarily interviewed by federal law enforcement agents in or around April 2016, prior to any public reports of the investigation in this matter. During that interview, KELLY admitted, in part and in substance, that Consultant-1 acted as a pass-through for the payments from the Energy Company to PERCOCO's wife but also falsely claimed that the arrangement was strictly for administrative ease.

**v.   PERCOCO Failed to Disclose Payments from the Energy Company**

    45.    Pursuant to the New York State Public Officers Law, certain employees of the Executive Chamber, including, during his State employment, JOSEPH PERCOCO, a/k/a "Herb," the defendant, are required

to file financial disclosure statements on an annual basis with the New York State Joint Commission on Public Ethics.  The financial disclosure statement is entitled "Annual Statement of Financial Disclosure" (the "Disclosure Form") and is required to be signed and presented for filing by the reporting individual.  A primary purpose of the Disclosure Form is to require high-ranking public officials to disclose outside income, activities, finances, and assets that may indicate a financial impropriety or conflict of interest.

        a.   At all times relevant to this Complaint, the Disclosure Form required reporting individuals, among other things, to list "completely" the "nature and amount of any income in EXCESS of $1,000 from EACH SOURCE for the reporting individual and such individual's spouse."  (Emphasis in original.)

        b.   In his required filings for the years 2012 and 2014, PERCOCO represented that his wife was employed by a limited liability company in the name of Consultant-1, and did not list the Energy Company.  As set forth herein, however, the representations made with respect to his wife were false and misleading because, in truth and in fact, and as PERCOCO well knew, PERCOCO's wife did not work for Consultant-1, but rather was employed by the Energy Company, which paid PERCOCO's wife through Consultant-1 at the direction of PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, in order to disguise the source of the payments.

## vi.   PERCOCO Agreed to Take Official Action for the Energy Company

        46.   As set forth in more detail below, based on my review of emails and interviews of individuals including Howe and various State employees and officials, I believe that in return for the secret monthly payments from the Energy Company to his wife, JOSEPH PERCOCO, a/k/a "Herb," the defendant, agreed to use, and did in fact use, his official position and influence to benefit the Energy Company and advance its interests as the need arose.  PERCOCO was effectively "on call" for PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, whenever KELLY required help for the Energy Company before the Executive Chamber or State agencies.  More specifically, in return for the payments to his wife, PERCOCO agreed to take, and did in fact take, official actions related to two State issues that were critical to the Energy Company's business:  the Reciprocity Agreement and the PPA.

**vii.    PERCOCO Helped the Energy Company Obtain the Reciprocity Agreement**

        47.    Based on my review of emails and interviews of, among others, Howe and an official at the DEC (the "DEC Official"), I know that in or about August 2013, at the request of PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, JOSEPH PERCOCO, a/k/a "Herb," the defendant, agreed to use, and in fact did use, his official position and influence to help the Energy Company obtain the valuable Reciprocity Agreement described above, which allowed the Energy Company to purchase emission reduction credits ("ERCs") in New York in connection with the power plant it was building in New Jersey. Evidence of this agreement includes the following:

        a.    On or about August 12, 2013, KELLY advised Howe that KELLY had been attempting to secure the Reciprocity Agreement from the DEC and a New Jersey state agency, and that the DEC Official "indicated that he could use a 'push from above' to get it done as a priority." I understand from reviewing Energy Company documents and interviewing an Energy Company employee that a certain number of ERCs were required before the New Jersey plant could become operational, and purchasing ERCs in New York was necessary at that time because there were a limited number available for sale in New Jersey and the cost of purchasing the ERCs in New Jersey was much higher than purchasing them in New York.

        b.    On or about August 14, 2013, PERCOCO responded to an email from Howe regarding the Reciprocity Agreement, stating that he (PERCOCO) would "check with" the Commissioner of DEC. Later in the same email chain, on or about August 24, 2013, PERCOCO responded to the same email chain and asked that the Former State Operations Director or another member of the Former State Operations Director's staff (the "Operations Deputy") "help [. . .] on this" because PERCOCO was dealing with a pressing personal situation. Approximately one hour later, the Former State Operations Director (who appears to have been blind copied on PERCOCO's email) agreed to assist.[4]

_____

        [4] The Former State Operations Director used his personal email in agreeing to take this action despite having a signature line that

c.    Based on my review of emails and my interview of the Operations Deputy, I learned that the Operations Deputy instructed the DEC Commissioner to enter into the Reciprocity Agreement. Specifically, on or about Tuesday, August 27, 2013, the Operations Deputy, responding to the same email chain, which contained all of the emails set forth in the above paragraphs, wrote to Howe, copying PERCOCO, stating, "Spoke to [the DEC Commissioner].  They are moving forward and will get it done ASAP."[5]

d.    Based on an interview of the DEC Official, I learned that the DEC Official received direction from the Governor's Office, via the DEC Commissioner's Office, to proceed with the Reciprocity Agreement.  The DEC Official indicated that without instructions from the Governor's Office to enter into the Reciprocity Agreement, which I believe, based on the emails and interviews described above, came initially from PERCOCO, the DEC likely would not have entered into the Reciprocity Agreement.

48.    Based on records obtained from the Energy Company and DEC, I learned that, in or around late 2014, the DEC and the New Jersey state agency signed the Reciprocity Agreement, which allowed the Energy Company to proceed with purchasing critical emission reduction credits in New York for its New Jersey power plant then in development, and resulted in significant savings to the Energy Company.

---

stated: "Important Note: Please direct any emails or questions regarding New York State official business to [the Former State Operations Director's New York State email address].  I will not reply to any emails dealing with state business on this account."

[5] Records obtained from the DEC indicate that just four days earlier, on or about of August 23, 2013, DEC had "not identified a material state interest to be served by the reciprocity agreement, other than interstate cooperation," and planned to confer with the Executive Chamber on whether to enter in to such an agreement.

35

### viii.   PERCOCO Took Official Action Regarding the PPA

49.   Based on my review of emails, documents obtained in the course of this investigation, and interviews of, among others, Howe and State employees, I know that starting in or about September 2012, JOSEPH PERCOCO, a/k/a "Herb," the defendant, agreed to use, and did in fact use, his official position and influence to help the Energy Company obtain the PPA described above.  While the PPA ultimately was not awarded to the Energy Company or to any other energy company in light of the State's energy needs, PERCOCO intervened and used his official authority in the Executive Chamber to exert pressure on behalf of the Energy Company in particular.

50.   Based on publicly available information, I learned that on or about April 3, 2013, NYPA issued the Energy RFP, which, as set forth above, sought proposals for new power plants and offered a PPA to purchase all output for up to fifteen years from any selected new power plant.  On or about May 20, 2013, the Energy Company filed its response to the Energy RFP, which, among other things, set forth its plans and progress to date to build the Power Plant.

51.   In the fall of 2013 -- as the New York State Public Service Commission ("PSC"), which was in charge of making selections under the Energy RFP, was in the process of making certain decisions regarding the Energy RFP -- JOSEPH PERCOCO, a/k/a "Herb," the defendant, agreed to take and in fact took official actions to advocate for the Power Plant, as follows:

a.   On or about September 18, 2013, Howe sent an email to PERCOCO which stated, in part, "When we talked last week, you asked that I send you a note on the 'fat man' project."  As set forth above, Howe and PEROCCO sometimes referred to PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, as "fat man."  The email continued: "They put up $14m, last week and are awaiting the results of the award. Word on the street is that the PSC Staff is recommending the starting up some old plants in the City, and not giving it to the [Energy Company] project.  As you know Labor is all over the [Energy Company] project. Again Fat Man said there is some former [State Official] who is spearheading the starting up [of old plants . . . .] Can you talk to your folks and see what the story is?"  PERCOCO responded, "I need that guys name asap!" and Howe replied with a name and employer.  Howe understood PERCOCO's response to mean that he intended to work to

36

stop the reigniting of old coal-fired plants that would potentially compete with the construction of the Energy Company's Power Plant.

       b.    On or about October 8, 2013, Howe wrote in an email to PERCOCO, reporting, "Herb – spoke to [the NYPA President] this morning about 'operation fat man'. He says you need to get Herbert focussed [*sic*] so he calls a meeting with all involved to coordinate otherwise those psc folks will be off the reservation. Seems like [the NYPA President] feels it should be done soon as this issue goes public mid-week next week. Will let you handle as you know best how to move forward." PERCOCO responded, "ok. Thanks." In reference to this email, Howe explained that "Herbert" is the Former State Operations Director (who was part of the same group of friends, including Howe and PERCOCO, who called each other "Herb") and that Howe was asking PERCOCO to influence the Former State Operations Director to set up a meeting with NYPA, NYSERDA, and the PSC to encourage the issuance of a PPA to the Energy Company.[6]

       c.    Two days later, on or about October 10, 2013, Howe wrote an email to PERCOCO reflecting that the NYPA President, among other things, "said he wants to make sure ALL the options come to [the Former State Operations Director]." PERCOCO responded, "Ta[l]king to herbert about it today. Thanks." I know from the context of this email, my review of many other similar emails in this investigation, and my discussions with Howe, that "Herbert" in this email refers to the Former State Operations Director, and that PERCOCO was emphasizing that he was going to talk to the Former State

---

[6] Howe forwarded this chain to KELLY, with a note, "See below... all good" but in doing so, Howe changed "operation fat man" to "[Energy Company]" and also changed "ok. Thanks" to "Ok. on it now. thanks." Howe has acknowledged that he revised this email and certain others before forwarding, and explained that he did so in part to emphasize that PERCOCO was advocating for the Energy Company, as PERCOCO had promised to do. When I reference herein PERCOCO's email statements, I am relying unless otherwise noted on original emails provided by PERCOCO's personal email service provider in response to judicially-authorized search warrants, or other sources for which there is no indication of alteration.

Operations Director to try to steer him to favor the Energy Company's bid to obtain the PPA.

      d.    On or about October 14, 2013, the NYPA President, from his personal email address, informed Howe that the Governor's then-Assistant Secretary for Energy (the "Former Energy Assistant Secretary") was trying to set up a briefing with the Former State Operations Director, and suggested, "You might want to tell [the Former State Operations Director] to make time – at least an hour – for him to understand the entire picture including all pros and cons." Based on my review of emails and discussions with State employees, I know the proposed meeting was to discuss certain issues related to the Energy RFP, including PPAs.

      i.    Howe forwarded this email chain to PERCOCO, stating, "Herb-can you push on [the Former State Operations Director] . . . the fat man is sweating it!"

      ii.    PERCOCO replied, "He always sweats!! Ok will get to herbert!!" I know from the context of this email, my review of many other similar emails in this investigation, and my discussions with Howe, that "Herbert" in this email refers to the Former State Operations Director, and that PERCOCO was again telling Howe that he would intervene with the Former State Operations Director regarding the PPA for the Energy Company.

      iii.    Howe replied, "Good man Herb!!! Thanks, concerned as the PSC is supposed to hold a meeting on this Thursday, so [the NYPA President] believes something will come out about this. Hold [the Former State Operations Director]'s feet to the fire Herb . . . got to keep the ziti flowing Herb!" Howe has explained that, in the email chain, he was telling PERCOCO to influence the Former State Operations Director to help the Energy Company get the PPA, which PERCOCO agreed to do -- and that by doing so, PERCOCO would be able to keep the "ziti" (*i.e.*, the monthly payments from the Energy Company to PERCOCO's wife) "flowing."[7]

---

[7] When Howe sent this email chain to KELLY, Howe edited the NYPA President's email to take out "for him to understand the entire picture including all pros and cons"; modified Howe's email to PERCOCO to

### ix.   PERCOCO Extorted KELLY for More Money After Learning that the Energy Company Would Not Receive the PPA

52.   Based on my interview of the Former Energy Assistant Secretary, I learned that, in or about October 2013, JOSEPH PERCOCO, a/k/a "Herb," the defendant, contacted the Former Energy Assistant Secretary and asked whether the Energy Company was going to be awarded a PPA under the Energy RFP.  The Former Energy Assistant Secretary advised PERCOCO that the Energy Company was unlikely to be awarded a PPA because there were other projects that were viewed more favorably by the reviewing committee.  The Former Energy Assistant Secretary recalled that PERCOCO appeared surprised by the Former Energy Assistant Secretary's response.  The Former Energy Assistant Secretary also explained that what he told PERCOCO was confidential information, to which the Energy Company did not have access, and in fact the Energy Company's application for a PPA remained pending for at least another 20 months.  The Former Energy Assistant Secretary further explained that he interacted infrequently with PERCOCO, and when they interacted it often related to logistics of the Governor's events.  This contact was one of very few such contacts on substantive issues that the Former Energy Assistant Secretary recalled having with PERCOCO during the approximately four years they both worked at the Governor's Office.

a.   On or about October 16, 2013, PERCOCO told Howe by email that Howe should call PERCOCO at his office in Manhattan and noted that Howe should "get the pine box 1st!!"  Howe understood "pine box" to mean casket -- *i.e.*, that there was going to be bad news for the Energy Company.  When they ultimately connected, Howe learned from PERCOCO that the Energy Company was not likely to be awarded the PPA.

---

add "You should be in mtg"; and modified PERCOCO's response to add "and make sure all is good"; and removed the last part of the chain about "ziti."  Howe explained that he made these edits for the same reasons as explained above.

53.   Based on my review of emails, documents obtained in the course of this investigation, and interviews of, among others, Howe and State employees, I believe that, in or around the end of 2013, JOSEPH PERCOCO, a/k/a "Herb," the defendant, and Howe deliberately did not inform PETER GALBRAITH KELLY, JR., a/k/a "Braith," the defendant, that they had learned that a PPA would not be forthcoming. To the contrary, PERCOCO and Howe decided to continue to assure KELLY that PERCOCO was using his official position and influence to help the Energy Company obtain a PPA so the Energy Company would continue to make payments both to PERCOCO's wife and to Howe through Howe's LLC.   In order to maintain the illusion, PERCOCO arranged several meetings in 2014 and 2015 between KELLY and State officials who held relatively senior positions but, in reality, had little or no involvement in the Energy RFP and PPA selection processes.   Evidence of PERCOCO's efforts to continue to extract money from KELLY includes, among other things, the following:

a.   In or around July 2014, PERCOCO arranged a meeting between KELLY and the Chairman of Energy and Finance for New York, a member of the Governor's Cabinet who is often referred to as the State's "energy czar," and to whom the following State agencies report -- NYPA, NYSERDA, DPS and the Long Island Power Authority (the "Energy and Finance Chair").

i.   On or about July 17, 2014, KELLY wrote to PERCOCO: "Joe – wondering if you had a couple minutes to talk Monday?   I'm taking heavy heat. A quick conversation could help a lot."   In reference to this email, Howe explained that the Energy Company's leadership was criticizing KELLY for the lack of progress with respect to the PPA, as the Energy Company's application for the PPA was still pending.

ii.   On or about July 18, 2014, Howe emailed PERCOCO, "Herb – getting messy. I told Braith that you were asking [the Energy and Finance Chair] to hold a meeting with Braith and the ISO [or, Independent System Operator] and determine if this deal is possible. [. . .]   This makes Braith happy.   And gets us out of the middle and the group determines if possible.   If he gets you on the phone just listen to him as I have been trying to keep this alive now at the end of the line as time has run out so a meeting is necessary."   Based on public documents, I know that the ISO is an organization that, among other things, operates wholesale electricity markets and manages transmission lines.

        iii.      On or about July 22, 2014, Howe wrote to PERCOCO, in part, "Handle fat boy carefully. We don't need an interruption in that Zitti delivery or else we[']ll really be up the creek.  Just need to tell him 'you called [the Energy and Finance Chair] and he is arranging a meeting the end of this week beginning of next week with himself, Braith and [an individual at the New York ISO] to figure out how to move this forward.'  We can not have any interruption in delivery, and right now we are teetering.  Ok?"  In reference to this email, Howe has explained that he was telling PERCOCO to pay attention to KELLY so that KELLY would feel assured that the Energy Company's interests were being handled by PERCOCO, and KELLY would then continue to pay Howe and PERCOCO's wife.

        iv.      Later that day, PERCOCO wrote to Howe, "ok. he is here in my ofc now" to which Howe replied, "Remember Zitti!!"  In reference to this email, Howe confirmed that "he" is KELLY.

        v.      Approximately 20 minutes later, PERCOCO emailed Howe that his meeting with KELLY "Just finished" and it "looks like [the Energy and Finance Chair] will see him and his guys this fri."  Howe replied, "Great work Herb!," to which PERCOCO replied "now do your part! sending new invoices shortly."  As set forth in more detail below, I know from documents I reviewed and from discussions with Howe, that around this time, PERCOCO sought payment through Howe from other clients of Howe who had business before the State, and Howe has confirmed that the "invoices" PERCOCO referred to relate to seeking payments from the Syracuse Developer.

        vi.      Based on interviews with the Energy and Finance Chair's Chief of Staff (the "Chief of Staff") and the Energy and Finance Chair, I learned that PERCOCO asked the Chief of Staff to arrange a meeting between KELLY and the Energy and Finance Chair. The Chief of Staff ultimately arranged the meeting, which occurred on or about July 25, 2014.  PERCOCO's request to the Chief of Staff was the only such request for a meeting the Chief of Staff could recall receiving from PERCOCO.

        b.    On or about August 20, 2014, Howe informed KELLY that PERCOCO was "anxious" to set up a meeting for KELLY with the newly-appointed Director of State Operations (the "State Operations Director"), who had recently replaced the Former State Operations Director.  Howe and PERCOCO then worked to set up this meeting, as follows:

i.      On or about October 1, 2014, at approximately 7:50 a.m., Howe wrote to PERCOCO, "Herb – Braith wants to meet with [the State Operations Director] this Friday either in NYC or Albany [. . .] Can you make it happen?" Approximately three hours later, PERCOCO wrote, "Have Braith call [the State Operations Director's Administrative Assistant] at [phone number] and ask to see [the State Operations Director] Friday in NYC. [They] are expecting the call." In an interview, the State Operations Director's administrative assistant confirmed that PERCOCO requested a meeting between KELLY and the State Operations Director around this time, and it was one of relatively few meetings the administrative assistant recalled PERCOCO requesting for the State Operations Director.

ii.      Howe replied to PERCOCO, "On it. Make sure to have the 'be receptive' discussion with [the State Operations Director]. Don't want to tip over the Zitti wagon." Based on an interview of Howe, I understand that Howe was explaining to PERCOCO that the State Operations Director had to appear receptive to KELLY so that KELLY would continue to pay PERCOCO and Howe.

iii.      Ultimately, due to a scheduling conflict, the State Operations Director sent his Deputy Director to the meeting. After the meeting, Howe informed PERCOCO that KELLY was upset and gave Howe "an earful."

c.      In or around March 2015, PERCOCO and Howe arranged a meeting for KELLY with the Secretary to the Governor. In an email to the Secretary to the Governor, Howe wrote, "As Joe told you, Braith is 'family' and we have been trying to figure out his project for the last few years..." The Secretary to the Governor replied that he looked "forward to connecting with Braith."

**x.      KELLY Stopped Payments to PERCOCO's Wife After It Became Apparent that the Energy Company Would Not Receive the PPA**

54.      Based on my review of publicly available information and my interviews of various State employees I know that, to date, NYPA has not selected any new power generation projects nor has it awarded a PPA to any company in connection with the Energy RFP.

55.      Based on interviews of, among others, Howe and employees of the Energy Company, and my review of emails, I believe that by

42

in or around the spring of 2015, it had become clear to PETER GALBRAITH
KELLY, JR., a/k/a "Braith," the defendant, that the Energy Company
likely would not be getting the PPA, and the Energy Company's need
for the PPA had lessened because the Energy Company had obtained at
least some private funding for the construction of the Power Plant.
In or around June 2015, the Energy Company stopped paying the monthly
retainer for Howe that it had been paying to Howe's LLC, and Howe
reached out to KELLY by email to try to get paid.  Based on the
interview of the External Affairs Manager, I learned that, in or around
August 2015, KELLY informed the External Affairs Manager that funding
for the wife of JOSEPH PERCOCO, a/k/a "Herb," the defendant, would
not be included in the Energy Company's budget for 2016.  In an email
dated November 23, 2015, the External Affairs Manager discussed with
KELLY the new payment structure for teachers, a per diem of $250 per
day (far less than PERCOCO's wife was paid in the preceding years)
and noted that the External Affairs Manager wanted to hire a new
teacher.  Based on my interview of the External Affairs Manager, I
understand that the new teacher was being hired to replace PERCOCO's
wife, and would be paid at the new per diem rate.

56.  Financial records reflect that the last payment from
Consultant-1 to the wife of JOSEPH PERCOCO, a/k/a "Herb," the
defendant, was on or about January 28, 2016.

## B. *The Syracuse Developer Paid Bribes to PERCOCO in Exchange for Official Action*

57.  As set forth in more detail below, even after JOSEPH
PERCOCO, a/k/a "Herb," the defendant, was able to get the Energy
Company to make payments to his wife in the amount of $7,500 per month,
PERCOCO remained in a difficult personal financial situation and tried
to address this by seeking additional money from Howe's clients who
had business before the State.  Beginning in or around early 2014,
PERCOCO, through Howe, solicited bribe payments from the Syracuse
Developer.  In response to these requests, in or around the spring
of 2014, PERCOCO, Howe, and two executives of the Syracuse Developer
-- President STEVEN AIELLO and General Counsel JOSEPH GERARDI, the
defendants -- entered into a bribery scheme whereby the Syracuse
Developer would make tens of thousands of dollars in payments to
PERCOCO, using Howe as a pass-through to help conceal that the payments
to PERCOCO came from the Syracuse Developer, and in exchange, PERCOCO
agreed to use, and did in fact use, his official position and influence
to assist the Syracuse Developer with a number of issues as the

opportunities arose.  Specifically, PERCOCO agreed to, and did, take
official action to (a) reverse the adverse decision by the Empire
State Development Corporation ("ESD"), which is the State's main
economic development agency, that would have required the Syracuse
Developer to enter into a costly labor peace agreement ("LPA"),
(b) free up a backlog of State funds that had already been awarded
to the Syracuse Developer but were delayed in payment, and (c) secure
an approximately $5,000 raise for AIELLO's son, who worked in the
Executive Chamber.

**i.    PERCOCO Solicited Bribe Payments from the Syracuse Developer**

58.   Based on my review of emails and my discussions with Howe,
I learned that, in or about January 2014, while still employed as
the Deputy Executive Secretary to the Governor, JOSEPH PERCOCO, a/k/a
"Herb," the defendant, began discussions with Howe about how PERCOCO
wanted to receive payments from the Syracuse Developer.  For example:

a.   On or about January 15, 2014, PERCOCO and Howe were
scheduled to meet with STEVEN AIELLO, the defendant, at the Governor's
Office in New York, New York.  Shortly before that meeting, Howe
emailed PERCOCO and advised PERCOCO to "Lay it on thick , govs loves
you [. . .] Lay it on heAvy Herbie! Zitti herb! Zitti!!" PERCOCO
then responded, "I may pull gov and herbert in to say hello to him
if they are still here!"  Howe replied, "That would be great!  Worth
another crate of Zitti!"  Howe has explained that the "herbert"
referenced in PERCOCO's message was the Former State Operations
Director, and that PERCOCO was suggesting that he might have the
Governor and the Former State Operations Director greet AIELLO during
AIELLO's visit to the Governor's Office in order to be able to later
solicit "zitti" from the Syracuse Developer.  Howe has confirmed that
the meeting with AIELLO, the Governor, and the Former State Operations
Director took place, which is corroborated by records showing that
AIELLO did in fact visit the Governor's Office that day.

b.   In a subsequent email in the same chain described above,
which appears to have been sent prior to the meeting, Howe
wrote, in part, that Howe had suggested to AIELLO that PERCOCO might
eventually seek AIELLO's advice about the Syracuse region in
connection with the Governor's upcoming reelection campaign.
PERCOCO, however, responded, "only if that other thing happens!  I
will advise him on how to play a role and be relevant!"  Howe has

explained that the "other thing" referred to PERCOCO's expectation
that he would receive payments from the Syracuse Developer.

59.    Based on my review of documents and emails and an interview
with a former assistant counsel to the Governor (the "Assistant
Counsel"), I know that in or around July 2014, before JOSEPH PERCOCO,
a/k/a "Herb," the defendant, left the Executive Chamber to work as
the Governor's campaign manager, PERCOCO sought an opinion from the
Assistant Counsel about the possibility of PERCOCO working private
sector jobs while he was employed as the Governor's campaign manager.
Based on the interview with the Assistant Counsel and related
documents, and the information uncovered in this investigation, I
believe that PERCOCO provided false and misleading statements when
he met with the Assistant Counsel and sought the Assistant Counsel's
guidance.  For example, PERCOCO informed the Assistant Counsel that
he planned to work at a law firm on issues related to labor
organizations, and that he would work only on issues pending before
municipal governments.  Percoco did not mention that he anticipated
to work on issues related to New York State government when, in truth
and in fact, and as set forth below, PERCOCO did not expect that his
work would be strictly confined to issues pending before municipal
governments.  Instead, at the time of this conversation, PERCOCO
already was planning to receive payments from the Syracuse Developer,
which, as he well knew, had substantial business before the State.

a.    On or about the same day of the meeting with PERCOCO,
the Assistant Counsel wrote a memorandum, dated on or about July 9,
2014, with the subject line "Post-Employment Ethics
Rules/Restrictions" (the "Employment Memorandum").  The Employment
Memorandum addressed whether PERCOCO would be allowed under New York
State law to work at a law firm on issues before municipal authorities.
The Assistant Counsel wrote, in part, "Joseph Percoco has asked
whether Public Officers Law (POL) § 74, subd. 8 impacts his post-State
employment activities.  He has advised me that he has been asked by
a law firm to engage in discussions with various labor organizations
on local matters pending before local municipalities."  The Assistant
Counsel concluded that, "In sum: there are no restrictions on his
proposed activities.  The POL limits the actions of a covered State
employee with respect to appearances or matters before State agencies,
not local governmental entities."

b.    The Employment Memorandum expressly pointed out that

PERCOCO was barred by State law from working on issues pending before
State agencies or the Executive Chamber.  The Assistant Counsel wrote
that, for two years after leaving State service, "an Executive Chamber
employee is prohibited from receiving compensation for services
rendered in connection with any matter before the Executive Chamber
and is also prohibited from appearing or practicing before the
Executive Chamber or any state agency."  (Emphasis in original.)

        c.   The Assistant Counsel has explained that his advice
with respect to PERCOCO's post-State employment would have been
different if PERCOCO had proposed working on behalf of clients with
business before New York State government.  The Assistant Counsel
also stated that, following their early July 2014 meeting, PERCOCO
did not seek any additional advice or guidance from the Assistant
Counsel.

        d.   On or about July 10, 2014, PERCOCO forwarded the
Employment Memorandum to Howe.  In response, Howe wrote, "Herb Zitti
!! Very nice."[8]

    60.   Based on my review of emails and my discussions with Howe,
I know that, in and around this same time period, between June and
July 2014, JOSEPH PERCOCO, a/k/a "Herb," the defendant, sent a number
of increasingly aggressive emails to Howe requesting additional
monetary payments from Howe's clients.  Based on my review of bank
records and the FBI's financial analysis, I know that PERCOCO had

_____

    [8] As described above, PETER GALBRAITH KELLY, JR., a/k/a "Braith,"
the defendant, told executives at the Energy Company on two separate
occasions that he had obtained a memo from the Governor's Office
approving the hiring of PERCOCO's wife.  Based on my review of
documents and interviews in this matter, the Employment Memorandum
cannot be the purported memo to which KELLY was referring.  First,
the Employment Memorandum was written more than a year after KELLY
first claimed he had seen such a memo and approximately one week after
KELLY, for a second time, claimed he had seen it.  Second, the
Employment Memorandum does not relate in any way to PERCOCO's wife's
employment, and it expressly prohibits PERCOCO from doing any work
on any matter pending before the Executive Chamber or any State agency.

an approximately $800,000 balloon payment due on his mortgage in or around July 2014.  Furthermore, PERCOCO indicated to Howe that he would not provide Howe's clients with his official assistance unless and until he received monetary payments.  For example:

       a.    On or about July 23, 2014, Howe forwarded PERCOCO an email from a client proposing a promotional opportunity for the administration and added, in part, "Herb – we should talk about this." PERCOCO replied, "ok. will deal with it after I get my ziti!"

       b.    Two days later, on or about July 25, 2014, Howe sent an email to PERCOCO related to the Energy Company in which Howe reported that "Braith Txd me to say [the Energy and Finance Chair] meeting went well.  Looks like a few more months of Zitti." PERCOCO replied, "I have no ziti herb. none. but . . . enjoy your vacation. I will send my kids in the backyard with the garden hose." Approximately two hours later, Howe asked PERCOCO to, among other things, speak with the Energy and Finance Chair about the Energy Company.  PERCOCO responded in part: "No. I cannot. I am barred from having those conversations."  Howe has explained that PERCOCO had never previously refused to intervene with a State official on behalf of the Energy Company (once the Energy Company had begun paying PERCOCO's wife), and in fact had repeatedly done exactly that despite "being barred from having those conversations."  Howe understood that PERCOCO's refusal to speak with the Energy and Finance Chair at this time was because PERCOCO was seeking additional money from other clients of Howe and had not yet received it.

## ii.   The Syracuse Developer Wanted PERCOCO's Assistance with ESD

      61.   Based on my review of emails, my discussions with Howe, and interviews with employees of ESD, I learned that, around this same time, in the summer of 2014, the Syracuse Developer was locked in a disagreement with ESD over whether, by law, one of the Syracuse Developer's construction projects in Syracuse required a costly labor peace agreement ("LPA") with organized labor.  Having failed to persuade ESD that its project did not need an LPA or to modify the project as suggested by ESD to avoid triggering the statutory LPA requirement, the Syracuse Developer repeatedly sought the assistance of JOSEPH PERCOCO, a/k/a "Herb," the defendant, to avoid the LPA requirement.

47

a.   The issue first arose in or around early summer 2014. At that time, the Syracuse Developer was constructing a parking lot (the "Parking Lot") in Syracuse.  ESD had awarded more than approximately $1.5 million to the Syracuse Developer for this project. On or about June 27, 2014, JOSEPH GERARDI, the defendant, informed ESD that a portion of the Parking Lot would service, among other things, a neighboring hotel and a future hotel that had not yet been built.

b.   On or about July 7, 2014, a Syracuse-based employee of ESD ("ESD Employee-1") emailed GERARDI and explained that "ESD legal counsel has reviewed the information you have provided" and "has determined that" because the Parking Lot will directly service a hotel, "ESD funding for this project will trigger the requirement for the Labor Peace Agreement (LPA) we previously discussed."  ESD Employee-1 instructed the Syracuse Developer to "please contact the appropriate local labor organization and negotiate an LPA at your earliest convenience."  From speaking with Howe and employees of ESD, I learned that certain State-funded construction projects that involve or relate to hotels require an LPA between the developer and the relevant hotel workers' unions, which would have significantly increased the cost of the Parking Lot.

62.   Based on my review of emails and interviews of, among others, Howe, I learned that STEVEN AIELLO and JOSEPH GERARDI, the defendants, were concerned that the need to obtain a LPA would delay construction of the Parking Lot or would compel the Syracuse Developer to forgo ESD funding.  AIELLO and GERARDI characterized their disagreement over the need for a LPA as "time sensitive."  In or around late July 2014, having failed to persuade ESD to change its mind on their own, AIELLO and GERARDI asked Howe to secure the help of JOSEPH PERCOCO, a/k/a "Herb," the defendant, in reversing ESD's decision that an LPA was necessary.

a.   On or about July 30, 2014, AIELLO emailed Howe and asked, in part, "is there any way Joe P can help us with this issue while he is off the 2nd floor working on the Campaign.  We can't seem to put it behind us.  I think Labor keeps drumming up their interpretation , to force us to sign with them.  I could really use an advocate with regard to labor issues over the next few months."

b.   The following day, on or about July 31, 2014, the head

of a regional body of a national labor union ("Labor Leader-1") wrote an email to AIELLO stating, in part, "Attached is a copy of the 'Labor Peace Agreement' that we spoke about at our meeting earlier this month. [. . .] I look forward to getting the Labor Peace Agreement finalized and signed." A few hours later, AIELLO forwarded this email to Howe and wrote, "Todd, can call Joe P. Need help on this. Thanks."

### iii.   The Syracuse Developer Paid PERCOCO Approximately $35,000

63.   Based on my review of emails and my discussions with Howe, I believe that, less than two weeks after STEVEN AIELLO and JOSEPH GERARDI, the defendants, sought the help of JOSEPH PERCOCO, a/k/a "Herb," the defendant, with respect to the LPA, PERCOCO, AIELLO, GERARDI, and Howe reached an agreement whereby the Syracuse Developer would pay PERCOCO approximately $35,000 in return for PERCOCO's use of his official influence to help the company, including with regard to the company's issues with ESD. The Syracuse Developer's payments to PERCOCO would be run through Howe, who acted as a pass through in order to disguise the source of the payments. Evidence of the disguised payments to PERCOCO include, among other things, the following:

a.   Based on my discussions with Howe, I learned that after AIELLO and GERARDI agreed to make payments to PERCOCO, AIELLO and Howe decided that the payments would be made through Howe's LLC (*i.e.*, the shell company Howe originally set up, in coordination with PETER GALBRAITH KELLY, JR. a/k/a "Braith," the defendant, to receive additional payments from the Energy Company) in order to mask the source of the payments, because AIELLO and Howe were concerned about the optics of paying PERCOCO while the Syracuse Developer had business and procurement contracts before the State. Accordingly, and as reflected in financial records I have reviewed, the Syracuse Developer paid PERCOCO by writing checks to Howe's LLC; and Howe then wrote checks in the same amount from Howe's LLC to PERCOCO's wife, to further disguise the source and nature of the payments.

b.   The Syracuse Developer's first payment to PERCOCO was made in August 2014. On or about August 11, 2014, Howe sent an invoice for approximately $15,000 from Howe's LLC to AIELLO. Howe wrote in the accompanying email, "Steve – per our discussion. Attached is the Labor Relations Invoice for June, July & August 2014. Thank you." According to the invoice, Howe's LLC sought payment for "NYS

Consultation / Labor Strategy-Relations / Labor Financing" work covering the "June-July-August, 2014" time period. Howe has explained that the invoice in fact sought payment for PERCOCO, ostensibly for PERCOCO's work for the Syracuse Developer even though PERCOCO had not yet performed any work on behalf of the company.

c. In or around mid-August 2014, the Syracuse Developer paid by check $15,000 to Howe's LLC. In turn, Howe wrote a check for the same amount to PERCOCO's wife, which was later deposited into the PERCOCOs' joint bank account.

d. A second payment from the Syracuse Developer to PERCOCO, in the amount of $20,000, was made in or around October 2014. As with the August 2014 payment, the Syracuse Developer paid by check $20,000 to Howe's LLC. Howe then sent a check for the same amount to PERCOCO's wife, which was subsequently deposited into the PERCOCOs' joint bank account using an automated teller machine ("ATM") located in Westchester County, New York.[9]

## iv. PERCOCO Pressured ESD to Reverse Its Decision on the Labor Peace Agreement

64. As set forth in more detail below, I believe, based on my review of emails and my discussions with Howe, that, in exchange for the $35,000 in payments from the Syracuse Developer, JOSEPH PERCOCO, a/k/a "Herb," the defendant, agreed to use, and did in fact use, his official position and influence to benefit the Syracuse Developer on at least three occasions as those opportunities arose. PERCOCO agreed to use, and did in fact, use his influence to cause ESD to

---

[9] As set forth above in paragraph 45, PERCOCO completed the Disclosure Form for the year 2014 in or around May 2015. Despite prior efforts to mask the payments from the Syracuse Developer by running the payments through Howe's shell company (i.e., Howe's LLC), PERCOCO ultimately represented that he earned consulting fees totaling approximately $50,000 to $75,000 from the Syracuse Developer on the Disclosure Form. Pursuant to State law, the disclosure forms of State employees, including PERCOCO's, are not made available to the public unless sought through a State Freedom of Information Law request.

reverse its decision that the Parking Lot required a costly LPA.  The
evidence showing PERCOCO's agreement to use, and his actual use, of
his influence on that issue includes, among other things, the
following:

a.   On or about August 22, 2014, JOSEPH GERARDI, the
defendant, emailed Howe and copied STEVEN AIELLO, the defendant.
GERARDI wrote, in part, "I wanted to follow up on ESD's position that
we are required to enter into a LPA, in order to be able to utilize
ESD funds [. . .] to construct a parking lot and infrastructure along
the eastern shore of the Inner Harbor development." GERARDI
continued, in part, "Steve and I wondered whether it would be
appropriate at this time to engage our labor consultant, to try to
resolve this matter, given that we would like to start construction
this fall, but will not be able to proceed if an LPA is required."
Howe has explained that GERARDI's reference to "our labor consultant"
referred to PERCOCO, who at this time had already been paid $15,000
by the Syracuse Developer.

b.   On or about August 28, 2014, Howe sent an email to
PERCOCO and wrote, in part: "Will provide you with [Labor Leader-1]'s
number tomorrow, you need to call her let her know you don't see an
issue (as she agrees) with the need for a Laboe [sic] Peace Agreement
for the [Syracuse Developer] INter [sic] Harbor Hotel parking lot
project. [. . .]  Then after you hear from her that she's ok with it,
let [the Deputy State Operations Director] know so he can get the
damn ESD lawyer to drop it, as no one sees it as an issue other than
our own lawyer!"  From speaking with Howe and employees of ESD, I know
that the Deputy State Operations Director was the Executive Chamber
official responsible for development policies and therefore had
significant interaction with, as well as influence over, officials
at ESD.

c.   Also on or about August 28, 2014, Howe sent an email
to AIELLO and copied PERCOCO. Howe wrote, "Steve – email Joseph,
[Labor Leader-1's] number and he said he'd call her per our discussion
tonight regarding the need to have a Labor Peace Agreement for the
parking lot of the Inner Harbor Hotel.  Joe understands the message
that needs to be delivered and understands that [Labor Leader-1]
agrees with us, that there is no need for one given the lot is primarily
for the general public."

d.    In or about November 2014 -- after the Syracuse
Developer had paid PERCOCO a total of $35,000 -- AIELLO and GERARDI
again sought PERCOCO's assistance in attempting to change ESD's
decision requiring the LPA for the Parking Lot.  On or about November
19, 2014, GERARDI wrote an email to PERCOCO, copying AIELLO and Howe,
that explained the Syracuse Developer's unhappiness and disagreement
with ESD's requirement of an LPA.  The email began, "Hello Joe, [.
. .]  According to [ESD Employee-2], the local ESD Regional Director,
ESD NYC Counsel has determined that our 'project' will trigger the
requirement for a LPA."

e.    On or about December 1, 2014, ESD Employee-2 emailed
GERARDI to schedule time to discuss the LPA and "get this issue
resolved."  GERARDI then forwarded that email on or about December
3, 2014 to Howe, copying AIELLO, and wrote, in part, "Anything with
JP on this.  [ESD Employee-2] is pressing to 'resolve' this issue .
. . . . and we don't want to be in jeopardy of losing the ESD funding
. . . . . sorry to be a pest."

i.    Howe, in turn, forwarded the email to PERCOCO
with the message "???"  PERCOCO responded to Howe and wrote "stand
by."  By this time, the Governor had been reelected and PERCOCO was
less than a week away from returning to his former State position.

ii.    Approximately ten minutes later, Howe wrote back
to GERARDI and AIELLO: "Just hung up with JP.  [ESD Employee-2] is
being informed as I type this that ESD HQ in NYC does NOT concur with
his read on this . . . . . JP said we should stand by and let message
sink in over next several hours and then look for ESD to reach back
out to you, with a 'different' perspective."  Soon thereafter, Howe
sent another reply stating, in part, "JP just called me back to say
[ESD Employee-2] should be reaching out to you.  Let me know when you
do and I'll close loop with JP."

iii.    The next day, on or about December 4, 2014,
GERARDI wrote an email informing Howe that ESD Employee-2 called and
stated that ESD had changed its position on the need for an LPA.
GERARDI reported, in part, "I wanted to let you know that I spoke
with [ESD Employee-2] this morning and he advised that they have
convinced ESD that the hospitality portion of the Syracuse Inner
Harbor development is relatively minor.  Therefore, the ESD funds
awarded can be used to build the parking lot and infrastructure

contemplated without the need for a LPA. [. . .] Thank you and JP for your efforts!"  AIELLO responded, "They convinced ESD? Laughable!"  Howe then replied, "Amazing how [ESD Employee-2] re-writes history!"

        f.    Based on my discussions with Howe and interviews with employees of ESD, I learned that the Syracuse Developer in fact was not required to obtain an LPA for the Parking Lot and was allowed to use ESD funds for the project.

### v.   PERCOCO Assisted the Syracuse Developer in Obtaining the Release of State Funds

      65.   I also believe, based on my review of emails and my discussions with Howe, that, in exchange for the $35,000 he was paid by the Syracuse Developer, JOSEPH PERCOCO, a/k/a "Herb," the defendant, also agreed to use, and did in fact, use his official position and influence on a second State matter of concern to the Syracuse Developer: the release of more than $14 million in State funds that had previously been awarded to the Syracuse Developer but had not yet been paid out due to backlogs at certain State agencies. The evidence showing PERCOCO's use of his official position and influence on this issue includes, among other things, the following:

        a.    In or around mid-2015, the State had not yet released significant blocks of funds to the Syracuse Developer for the construction of certain CNSE projects that had previously been awarded to the Syracuse Developer.  As set forth in more detail below, in or around the end of 2013, CNSE chose the Syracuse Developer as its preferred developer in the Syracuse area and subsequently awarded the Syracuse Developer two major construction projects, specifically, an approximately $90 million manufacturing plant and an approximately $15 million film hub (the "Film Hub").  By in or around August 2015, the Syracuse Developer complained that approximately $14.2 million in State payments were either past due or about to come due on the two projects.  Pressured by subcontractors and vendors that were threatening to stop working unless they were paid, STEVEN AIELLO, the defendant, and Howe asked PERCOCO, who had returned to his position as Executive Deputy Secretary, to intervene and help secure the release of those payments.

        b.    On or about August 31, 2015, AIELLO notified Howe and an employee of CNSE about a "vendor demanding payment" in connection

with the manufacturing plant. AIELLO wrote: "Help!! It's mounting!"
Howe forwarded AIELLO's email to PERCOCO and asked him to attend a
conference call with Howe, AIELLO, GERARDI, an employee of CNSE, and
an employee at the Dormitory Authority of the State of New York
("DASNY"), which is responsible for facilities financing and
construction. As Howe explained in the email, the purpose of the call
was "to go over these asap this week if your schedule permits? As
we discussed, [the Syracuse Developer] is getting hit left and right
by vendors who are threatening to walk off the job . . . etc." PERCOCO
responded, "ok. let me find out who is the right person to talk to
at dasny. thanks."

        c. Based on emails sent and received from PERCOCO's
personal email account, I believe that within a day of the above
exchange with AIELLO, PERCOCO had determined that the State Division
of the Budget ("DOB") was the source of the delay in releasing the
State funds to the Syracuse Developer, and that PERCOCO would meet
with the DOB himself to try to resolve the issue. In an email sent
on or about September 1, 2015, PERCOCO told Howe to "do a mtg on this
tomorrow with budget folks which is where I am told this is stuck.
thanks." Howe responded and asked PERCOCO to "do call with us?? They
aren't going to listen to us." PERCOCO, however, responded, "you
misunderstood me. I am doing the mtg with budget. as of now I dont
need your guys on the call."

        d. On or about September 3, 2015, Howe asked PERCOCO,
"how did you make out with Budget on [the Syracuse Developer]. Out
here in Syracuse and Steve is having a heart attack? Do you need a
call with the [CNSE] folks to get budget anything?" PERCOCO replied,
"No. Sit tight. Mtg is today."

        e. The next day, on or about September 4, 2015, Howe
emailed PERCOCO again to ask, in part, for "an update on the DOB meeting
yesterday." PERCOCO responded, "There are some checks that are being
freed up from the slow process next week. I am getting the exact list
as we speak."

        f. On or about September 9, 2015, the Deputy State
Operations Director wrote to an employee of the DOB ("DOB Employee-1")
and asked about the "timeframe" of the first significant disbursements
for the Film Hub. Later the same day, DOB Employee-1 replied, in part,
"$1.184m: Should happen within a week or so, depending on DASNY and
SUNY Poly's responsiveness. <u>DOB has allocated the funds.</u> We're

checking with DASNY on [grant disbursement agreement] status, information outstanding from SUNY Poly and anything else needed for payment." (Emphasis in original.)  Based on my review of emails and publicly available sources, I learned that, after the DOB made the Film Hub funds available, DASNY had to complete its own approval process and then enter into a grant disbursement agreement with Fort Schuyler, which, in turn, would provide the Film Hub funds to the Syracuse Developer.

g.     Based on my review of emails, I know that, in or around the second of half of September 2015, DASNY requested certain additional documents from Fort Schuyler and the Syracuse Developer related to the Film Hub funds.

h.     On or about September 30, 2015, Howe forwarded a text message from AIELLO in which AIELLO expressed disappointment that he had not been invited to the events surrounding the Governor's visit to Syracuse that was scheduled to take place later that day.  In a follow-up email to PERCOCO and the Deputy State Operations Director that day, Howe wrote, in part, "Today is just another nail in Steve"s [sic] back, he wasn't even invited to attend.  We need to put ourselves in his position.  He built one building on time and completed it and can't get final payment and he's half way done on a second building and hasn't gotten paid a penny, we constantly ask him to help us. . . .  It's not a good situation.  It's an issue of managing our friends.  We just can't abandon them when things get tough and I think that's what he is venting about."

i.     In a reply soon thereafter, PERCOCO asked, in part, "agree with you todd about abandoning people. [Deputy State Operations Director] why didn't we invite steve?"

ii.     Howe replied and wrote, in part, "Just need your help to get that funding moving the bureaucracy is killing them."

iii.     PERCOCO responded to Howe's email and stated, in part, "I have done everything I can.  The small check should be breaking free [. . .] soon.  The problem is your client at nano.  You fix.  I am fucking pissed at nano and the team there. [. . .]  I need a mtg with you, alain and [the current Secretary to the Governor] asap!  I am fuckin pissed!!!!"  Based on my review of emails and my participation in this investigation, I know that the "client at nano" refers to CNSE, which, as set forth above, was a client of Howe and

has the nickname "Nano" and that "alain" refers to ALAIN KALOYEROS, a/k/a "Dr. K," the defendant.

            iv.     In a subsequent email in the same chain, also sent on or about September 30, 2015, the Deputy State Operations Director wrote, "I spoke to Steve directly. He will be at the site and have a few construction workers from the hotel ready to greet the gov at 115."

            v.     Howe replied, "Thank you.  This eases the funding headache.  Important that community see this project is still on Govs radar screen."

            vi.     I learned from reviewing emails and media reports that, later the same day, on or about September 30, 2015, the Governor toured a hotel located in the Syracuse Inner Harbor that was being constructed by the Syracuse Developer and met with, among others, AIELLO.

### vi.   PERCOCO Secured a Raise for AIELLO's Son

        66.   I also believe, based on my review of emails and my discussions with Howe and State employees, that, in exchange for the $35,000 he was paid by the Syracuse Developer, JOSEPH PERCOCO, a/k/a "Herb," the defendant, agreed to use, and did in fact, use his official position and influence in a third way to benefit the Syracuse Developer: to secure a salary increase of approximately $5,000 for the son of STEVEN AIELLO, the defendant, ("AIELLO's Son") who worked in the Executive Chamber.  The evidence showing PERCOCO's use of his official position and influence with respect to AIELLO's Son's salary includes, among other things, the following:

            a.     In or around July 2014, AIELLO's Son left his job at New York State Housing and Community Renewal ("HCR") to work on the Governor's reelection campaign as an assistant to PERCOCO. AIELLO'S Son was not paid while working for the campaign.  Following the election in November 2014, AIELLO's Son returned to HCR and then moved to a position in the Executive Chamber in or around September 2015. Between November 2014 and around August 2015, AIELLO's Son received two raises and a locality adjustment, increasing his salary approximately ten percent.  From speaking with, among others, an employee of the Executive Chamber who managed a variety of human resources issues and reported directly to PERCOCO ("Chamber

Employee-1"), I learned that salary increases for Executive Chamber employees are usually limited to no more than ten percent in a given year.  Chamber Employee-1 could not recall any specific employee who has received a salary increase of greater than ten percent.

b.      Notwithstanding the ten percent increase in his son's salary in less than a year, AIELLO sent an angry text message to Howe on or about September 25, 2015 complaining about the modest size of his son's most recent pay raise: "I just got a call from [my son], he got his paperwork for his raise.  He went from 54 thousand a year to 56 thousand!  We have waited patiently months for money for these projects with [CNSE].  The administration has embarrassed me in my community, as a slow pay.completely tarnished our reputation, we are considered a slow pay.  [My son] bust his ass, loyal as the day is long.  I have been loyal as the day is long.  They insult us like this.  I'm finished!!!  Everybody else gets what they need and want.  I keep giving.  It's a sad statement!"  Howe forwarded AIELLO's text to PERCOCO, and added: "I told Steve just now that I spoke to you and you were going to address the salary issue today [. . .]  try to get him to 65 k or above."  Howe then followed up later that same day, and PERCOCO responded, "I am working on it herb!"[10]

c.      Based on my review of emails, publicly available documents, documents obtained in the course of this investigation, and interviews of, among others, Howe and employees of the Executive Chamber, I learned that, on or about September 25, 2015 -- the same day that Howe passed along AIELLO's complaints to PERCOCO -- PERCOCO sent an email to Chamber Employee-1 and three employees of the State Office of General Services ("OGS"), which handles certain human resources issues for the Executive Chamber.  PERCOCO asked: "What

---

[10] This email echoed one from several months before.  On or about May 27, 2015, Howe emailed PERCOCO and wrote, in part, "got a call from Steve Sr.  Wanted to see if you could try and help jr. with that salary issue we had talked about?"  Howe then specifically asked, "Is it impossible for him to get a $10k bump? He's at 54 k now is it possible to get him to 64k. ?"  At the time, PERCOCO had responded, in part: "Tough do [sic] $10k bump.  Can do $6k now then the rest later after session.  Concerned about optics."

happened with [AIELLO's Son's] raise when he was moved to policy team? I am told he never got it. Also, we discussed moving him out of HCR?"

          i.      An employee of OGS ("OGS Employee-1") responded, "We moved him out of HCR. Didn't know it was supposed to go with a bump. 10%?"

          ii.     PERCOCO replied, "This is another stupid blunder. Another we had no idea. BS. I raised this months ago. Now he is quitting because you guys cant get the simplest things executed. [Chamber Employee-1], you handle this. I will call you."

          iii.    OGS Employee-1 informed PERCOCO that they would prepare a request for an additional ten percent salary increase; OGS then submitted the request to the DOB, which approved the raise on or about September 28, 2015. From speaking with Chamber Employee-1 and two of the OGS employees copied on the above email, I learned that they had no recollection of PERCOCO being so involved in seeking the raise of any other Executive Chamber employee.

          d.    On or about September 25, 2015, approximately two hours after PERCOCO learned the salary increase request had been submitted to the DOB, PERCOCO emailed Howe and wrote, "[AIELLO's Son] issue resolved. will take effect immediately. spoke to him and all is good." I know that, in fact, AIELLO's Son did receive a ten percent raise amounting to approximately $5,700 per year on or about October 1, 2015 that was made retroactive to on or about September 24, 2015. The raise pushed his total salary to approximately $65,000 per year.

## IV.   THE BUFFALO BILLION FRAUD AND BRIBERY SCHEME

    67.   The PERCOCO Bribery Scheme described above was not the first scheme involving bribery and unlawful access to State benefits in which the Syracuse Developer participated. Rather, as described below, beginning in or around 2013, the Syracuse Developer and the Buffalo Developer conspired with Howe and ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, to defraud Fort Schuyler -- which was charged with awarding significant development contracts paid for with taxpayer dollars obtained from ESD -- into giving lucrative contracts to the Syracuse Developer and the Buffalo Developer.

68.   As part of this scheme, the Syracuse Developer and the Buffalo Developer paid bribes to Howe, which were purported to be "consultancy" payments and bonuses but which were in fact payments for Howe's actions in his capacity as an agent and representative of CNSE and the Research Foundation who had, along with ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, substantial control over Fort Schuyler's State-funded development projects.   In exchange for the payments to Howe, and as described more fully below, Howe worked with KALOYEROS to defraud Fort Schuyler by secretly rigging the bids for large development deals so that they went to the Syracuse Developer and the Buffalo Developer, while falsely representing to Fort Schuyler that the bidding process was fair, open, and competitive.   In particular, as set forth below, (a) KALOYEROS caused Fort Schuyler to issue purportedly competitive requests for proposal ("RFPs") for companies to be named preferred developers for CNSE in Buffalo and Syracuse, where CNSE intended to undertake significant development projects paid for under the Buffalo Billion initiative and other state development programs; (b) KALOYEROS and Howe secretly tailored the RFPs so that the RFPs requested qualifications held by the Syracuse Developer and the Buffalo Developer; and (c) Fort Schuyler's evaluation committee and Board of Directors evaluated and voted on the bids not knowing that KALOYEROS and Howe had prevented competing bids and designed the requirements to fit the Syracuse Developer and the Buffalo Developer.   For his part in the scheme, KALOYEROS was able to maintain his leadership position and substantial salary at CNSE and garner support from the Office of the Governor for projects important to him, including the creation of SUNY Poly.

## A. *KALOYEROS Hired Howe to Be an Agent and Representative of CNSE*

69.   Based on my review of emails and interviews with, among others, Howe, I learned that, in or around the fall of 2011, ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, contacted Howe for the purpose of retaining Howe as a consultant for CNSE.   As set forth above, Howe had close connections to the Office of the Governor, whose support would be helpful with two goals of KALOYEROS: (i) the receipt of State funding; and (ii) the merger of CNSE into SUNY Poly, which KALOYEROS would found and lead.   Among other things, Howe understood that KALOYEROS was concerned about his relationship with the Office of the Governor and was worried that he might lose his leadership position at CNSE.   According to public records, in 2011 KALOYEROS was paid a salary of approximately $800,000 and received at least $500,000 in additional compensation through grants and/or other

payments.   KALOYEROS accordingly told Howe that he wanted to hire
Howe to help KALOYEROS maintain his position at CNSE/SUNY Poly,
assist CNSE in its relationship with the Office of the Governor, and
represent CNSE in its efforts to undertake large, State-sponsored
development projects.

70.   Based on my review of documents obtained from CNSE and the
Government Relations Firm and its associated Law Firm, and interviews
with, among others, Howe and individuals associated with CNSE and
Fort Schuyler, I learned that in or around 2012, ALAIN KALOYEROS,
a/k/a "Dr. K," the defendant, caused the Research Foundation to retain
Howe as a consultant for CNSE and Fort Schuyler, at a rate of $25,000
per month, which continued until at least in or about 2015.   These
payments were made to the Law Firm.   During the relevant time period,
Howe physically worked at CNSE approximately twice per week.   Howe
had a parking space and an office at CNSE.   Although the location of
the office changed from time to time, it was always near KALOYEROS's
office.

## B. *Executives of the Syracuse Developer and Buffalo Developer Bribed Howe for His Assistance in Obtaining State Contracts*

71.   Based on my review of emails, publicly available and other
documents, and interviews with, among others, Howe, I learned that
throughout 2013 and 2014, STEVEN AIELLO and JOSEPH GERARDI, the
defendants, caused the Syracuse Developer to pay Howe as a
"consultant" knowing that Howe was acting as an agent and
representative of CNSE and intending for him to use his official
position for their benefit, as set forth below.

a.   In or around November 2011, AIELLO, on behalf of the
Syracuse Developer, entered into an agreement with the Government
Relations Firm (which was run by Howe) under which Howe would serve
as a "consultant" (and not a lobbyist), and the Syracuse Developer
would pay the Government Relations Firm $6,500 per month.   The
following year, the Syracuse Developer expanded its relationship with
Howe, agreeing to pay an additional $7,500 per month, for a total
fee of $14,000 per month.

b.   In or around August 2014, October 2014, November 2014,
and June 2015, which were after the Syracuse Developer was named CNSE's
preferred developer for Syracuse as set forth below, the Syracuse

Developer paid Howe bonuses totaling at least approximately $385,000. These bonuses were not paid to the Government Relations Firm. Rather, $135,000 in bonuses were paid to Howe's LLC, and $250,000 in bonuses were paid directly to Howe.

          c.     Further, I have learned from Howe that he kept AIELLO informed as he (Howe) negotiated his role at CNSE with ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, and that Howe informed AIELLO and GERARDI of his official role and influence within CNSE. This fact has been corroborated by, among other things, an interview of a principal of another development company who worked with Howe, who stated that Howe told him, in substance and in part, that Howe acted as an agent and representative of CNSE in finding partners for development projects; interviews with certain State employees; and emails (including ones described below) in which Howe forwarded to AIELLO and GERARDI communications with KALOYEROS and other individuals associated with CNSE in which internal CNSE business was discussed.

          72.   Based on my review of emails, publicly available and other documents, and interviews with, among others, Howe, I learned that throughout 2013 and 2014, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, caused the Buffalo Developer to pay Howe as a "consultant" knowing that he was acting as an agent and representative of CNSE and intending for him to use his official position for their benefit, as set forth below.

          a.     In or around January 2013 -- just as the Buffalo Developer began seeking large State contracts through the Governor's Buffalo Billion initiative -- SCHULER, on behalf of the Buffalo Developer, entered into an agreement with the Law Firm, through which the Government Relations Firm would provide "strategic advice and counsel regarding business generation initiatives across New York State." The agreement specified that it would not include any lobbying of State or Federal officials. In return for Howe's services, the Buffalo Developer agreed to pay $100,000 per year. Prior to this agreement, the Buffalo Developer had not retained or paid any money to Howe or the Government Relations Firm.

          b.     I believe, based on my review of emails and interviews with, among others, Howe, that before and during the time in which CIMINELLI, LAIPPLE, and SCHULER caused the Buffalo Developer to pay Howe, they knew that Howe was an agent of CNSE who had substantial

61

influence with ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, the
President of CNSE and a board member of Fort Schuyler.  In particular,
Howe has stated that, in or around the end of 2012, he approached
CIMINELLI and told CIMINELLI, in substance and in part, that he (Howe)
was acting on behalf of the Office of the Governor and CNSE, which
were looking for help in creating large development projects in the
Buffalo area.  CIMINELLI, LAIPPLE, and SCHULER's knowledge that Howe
was acting as an agent and representative of CNSE has been corroborated
by, among other things and as noted above, an interview of a principal
of another development company who worked with Howe, interviews with
certain State employees, and emails in which Howe forwarded to LAIPPLE
and SCHULER communications with KALOYEROS and other individuals
associated with CNSE in which internal CNSE business was discussed.
For example:

    i.  On or about October 7, 2013, Howe forwarded to
LAIPPLE and SCHULER an email exchange between Howe and KALOYEROS in
which Howe and KALOYEROS discussed internal CNSE matters, including
personnel matters, as well as the timing and method of the announcement
of the Buffalo RFP.  In his email to LAIPPLE and SCHULER, Howe stated,
"we decided to get this Buffalo [RFP] out asap."

    ii.  On or about December 3, 2013, Howe forwarded an
email·between him, a partner at the law firm representing CNSE, and
a representative of another company that had business with CNSE,
discussing business between that other company and CNSE.  In his email
to LAIPPLE and SCHULER, Howe wrote, among other things, "Keep this
close to the vest."

  73. Prior to the Fort Schuyler bidding process, individuals
associated with the Syracuse Developer, including STEVEN AIELLO and
JOSEPH GERARDI, the defendants, and the Buffalo Developer, including
LOUIS CIMINELLI, the defendant, had become significant contributors
to the Governor's election campaigns.  I believe that these
contributions were intended at least in part to develop a relationship
with the Office of the Governor that would help enable the Syracuse
Developer and the Buffalo Developer to obtain State-funded
development contracts.  Evidence of this intent includes the
following:

    a.  Based on my review of publicly available records and
interviews of Howe, I learned that from in or around 2001 through

in or around 2010, the Syracuse Developer did not make large contributions to State gubernatorial campaigns -- contributing a total of approximately $39,000 over that ten-year period.  Similarly, prior to the fall of 2011, AIELLO made two contributions to the Governor's campaign, each in the amount of $5,000, and GERARDI made no contributions to State gubernatorial campaigns.  During these years, as set forth above, the Syracuse Developer's business focused principally on private development projects.  Beginning in December 2011, however, as the Syracuse Developer began to seek State-funded development work with the assistance of Howe, contributions from its executives and related parties increased dramatically.  Beginning in December 2011, after the Syracuse Developer retained Howe, AIELLO, GERARDI, and other executives from the Syracuse Developer -- largely at the direction of Howe -- personally began making, and directed the Syracuse Developer to make, substantial campaign contributions to the Governor's campaign and related entities.  Specifically, from December 2011 through 2013, AIELLO, GERARDI, their family members, another executive of the Syracuse Developer ("Syracuse Developer Executive-1"), an entity associated with Syracuse Developer Executive-1, and the Syracuse Developer itself contributed at least approximately $250,000 to the Governor's election campaigns, with each contribution being in an amount of $10,000 or greater.  Notably, on or about July 9, 2013, which, as described below, was approximately one month before AIELLO and GERARDI supplied information to Howe to use to rig the Syracuse RFP, AIELLO, GERARDI, their family members, Syracuse Developer Executive-1, and the Syracuse Developer together contributed approximately $65,000 to the Governor's election campaign.  The following day, on or about July 10, 2013, an entity associated with Syracuse Developer Executive-1 made a $60,000 contribution to the Governor's election campaign.  As a result of these contributions, the Syracuse Developer has been publicly reported as the top donor to the Governor in or around upstate New York.

          b.   I know from my review of emails and interviews with Howe that Howe encouraged AIELLO and GERARDI to make contributions to the Governor's campaigns and to make contributions in higher amounts so that the Governor's Office would know and remember them.  For example, on or about May 18, 2011, Howe sent an email to AIELLO, in which Howe instructed, "you should hold on making any political $$ contributions to any state or federal electeds, so we can make sure you can [get] the most leverage out of them."

       c.    Between in or around December 2009 and January 2014, CIMINELLI and his immediate family members contributed at least $100,000 to the Governor's election campaigns. Additionally, in or around November 2013 -- when the Buffalo Developer's bid to become a preferred developer was under consideration by Fort Schuyler, as described below -- CIMINELLI hosted a fundraising dinner for the Governor, at which approximately $250,000 was raised.

       d.    Further, JOSEPH PERCOCO, a/k/a "Herb," the defendant, made specific requests to Howe for both the Syracuse Developer and the Buffalo Developer to make donations to the Governor's campaign, and Howe relayed those requests to the Syracuse Developer and the Buffalo Developer. For example, on or about November 12, 2013, PERCOCO wrote an email to Howe, in which PERCOCO stated that a commitment by CIMINELLI to host the fundraising dinner described above in which $175,000 would be raised for the Governor's re-election campaign "does not work Herb," because CIMINELLI had previously committed to a higher amount. As noted, the dinner ultimately raised approximately $250,000.

## C. *Fort Schuyler Was Defrauded into Awarding State Development Contracts to the Syracuse Developer and the Buffalo Developer*

     74.    Based on my review of emails, publicly available and other documents, and interviews with, among others, Howe, I learned that in 2013, ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, and Howe developed a plan to identify preferred developers for potential construction projects associated with CNSE in Syracuse and Buffalo, New York. This plan was motivated, in part, by the announcement of the Governor, in or about January 2012, that the State would invest $1 billion in Buffalo, New York. This plan included issuing two requests for proposal (the "RFPs"), one for Syracuse (the "Syracuse RFP") and one for Buffalo (the "Buffalo RFP"), that would give the appearance of an open competition to choose "preferred developers" in Syracuse and Buffalo. However, the Syracuse Developer and the Buffalo Developer had been preselected by KALOYEROS and Howe to become the preferred developers in Syracuse and Buffalo, respectively, after the Syracuse Developer and the Buffalo Developer had each made sizable contributions to the Governor and had begun paying Howe for Howe's access to the Governor and for Howe's influence over the RFP processes. These preferred developer contracts were particularly lucrative for the Syracuse Developer and the Buffalo Developer, as the Syracuse

Developer and the Buffalo Developer were then entitled to be awarded future development contracts of any size in Syracuse or Buffalo, respectively, without additional competitive bidding, and thus without competing on price or qualifications for particular projects. In order to award these valuable deals to the Syracuse Developer and Buffalo Developer, KALOYEROS and Howe manipulated the RFP process to prevent Fort Schuyler from receiving or being able to fairly consider competing bids.

i.   **Fort Schuyler Issued RFPs for Preferred Developers for Syracuse and Buffalo**

75.   Based on publicly available and corporate documents, and interviews with, among others, employees and members of the Board of Directors of Fort Schuyler, I have learned that the Board of Directors of Fort Schuyler has the authority to enter into agreements with private companies in which public funds will be spent to pay the companies to build facilities for CNSE.  Prior to entering into a significant contract with private companies, Fort Schuyler typically issues a "request for proposal."  "Request for proposal" is a term of art that refers to a type of solicitation in which an organization such as Fort Schuyler sets forth the fact that funding is available for a project and seeks bids from qualified and interested parties.  I know from speaking with members of Fort Schuyler's Board of Directors that, particularly with respect to State-funded projects, RFPs issued by Fort Schuyler were supposed to be designed and drafted to provide a fair, open, and competitive bidding process with respect to both quality and price, and accordingly should not be drafted to favor any particular potential bidder and should not be provided to any parties in advance of publication.

76.   Further, I learned that in or around 2013 and 2014, the Research Foundation had policies governing procurement that were used by Fort Schuyler.  As set forth in these policies, the procurement process was intended "to promote open and free competition in procurement transactions" and "to ensure that procurements are priced competitively and that the selection process is not influenced improperly."  Among other things, the policies required that "[s]uppliers that develop or draft specifications, requirements, statements of work, or requests for bids or proposals for a procurement must be excluded from competing in any resulting procurement."

77.   Based on my review of emails, publicly available documents and interviews of members of the Board of Directors of Fort Schuyler, I learned the following regarding the process by which the Board of Directors selected preferred developers for Syracuse and Buffalo:

a.   On or about August 20, 2013, ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, sent an email to Howe and to an executive of Fort Schuyler (the "Fort Schuyler Executive"), in which KALOYEROS told the Fort Schuyler Executive that KALOYEROS would "like to issue an RFP for a strategic partner in Syracuse and a similar one in Buffalo. It should not focus on a specific project, but more on a strategic partnership with local developers who know the two regions, are grass root, have the construction and business credibility, and are willing to expand in jobs and investments in those regions in partnership with CNSE."

b.   As set forth in more detail below, KALOYEROS and Howe worked together to draft the Syracuse and Buffalo RFPs.  I know, based on interviews of, among others, a former executive of Fort Schuyler, that KALOYEROS maintained close oversight and control over the day-to-day operations of CNSE and Fort Schuyler, including over the design of development projects and the drafting of RFPs.

c.   In or around October 2013, the Board of Directors of Fort Schuyler, by resolutions of the Board, issued the Syracuse and Buffalo RFPs, which requested proposals "for a strategic research, technology outreach, business development, manufacturing, and education and workforce training partnership with a qualified local developer" in the greater Syracuse area and in the greater Buffalo area, respectively.  Because the RFPs were designed to select preferred developers that would, once chosen, be able to obtain potentially hundreds of millions of dollars in State-funded contracts from Fort Schuyler without further competitive bidding, the RFP selection process had substantial economic importance for both Fort Schuyler and the Research Foundation, through which such future contracts would be funded. The Board Resolutions authorizing the RFPs each stated that the Fort Schuyler Board would approve a contract only "[u]pon completion of a competitive RFP process and evaluation of responses."  The RFPs themselves explained that Fort Schuyler would appoint a selection committee to review submissions, which would recommend the selection of a preferred developer to the Board of Directors of Fort Schuyler.  The Board of Directors of Fort Schuyler

66

had the final authority for making the selection of preferred
developers and authorizing contracts.

d.      Despite the highly lucrative nature of the contracts,
the Syracuse Developer ultimately was the only party to bid on the
Syracuse RFP, and the Buffalo Developer was one of only three parties
to bid on the Buffalo RFP.

e.      In or about December 2013, the Board of Directors of
Fort Schuyler voted to name the Syracuse Developer the preferred
developer for Syracuse, and in or about January 2014, the Board of
Directors of Fort Schuyler voted to name the Buffalo Developer one
of two preferred developers for Buffalo.   The Board of Directors based
its decisions on, among other things, matrices created by the
evaluation committee in which the evaluation committee compared each
bidder's submission to the qualifications set forth in the relevant
RFP.

ii.   **The Syracuse RFP Was Designed to Defraud Fort Schuyler**

78.   Based on my review of emails and interviews of, among
others, Howe, I learned, that, unbeknownst to members of the Board
of Directors of Fort Schuyler, the Syracuse RFP was designed so that
the Board of Directors of Fort Schuyler would have no choice but to
name the Syracuse Developer the preferred developer for Syracuse,
as follows:

a.      In or about August 2013, Howe informed JOSEPH GERARDI
and STEVEN AIELLO, the defendants, that Fort Schuyler would issue
the Syracuse RFP.  On or about August 15, 2013, GERARDI sent an email
to Howe, copying AIELLO and another executive of the Syracuse
Developer.  The subject line of the email stated: "[Syracuse
Developer] Company Qualifications and Experience."  Attached to the
email was a document entitled "[Syracuse Developer] Company
Qualifications.08-15.13" (the "Syracuse Developer Qualifications").

b.      The Syracuse Developer Qualifications contained a
list of qualifications of the Syracuse Developer and its executives,
including AIELLO and GERARDI.  For example, the Syracuse Developer
Qualifications stated that employees use "Sophisticated project
management tools, such as InSite SiteWork (www.insitesoftware.com)
to accurately and efficiently coordinate all aspects of site and

67

utility construction, to create ideal building conditions, and USGlobalNet, or USGN's (www.usgn.net) web-based project management software, to effectively manage all projects on budget and on schedule."

c.     On or about August 16, 2013, Howe replied to GERARDI'S email containing the Syracuse Developer Qualifications, writing "This works. Let me hand deliver to dr k. You guys should not email this to anyone but me. All good." I know based on my review of email and interviews with Howe and others that "Dr. K" is a nickname for ALAIN KALOYEROS, a/k/a "Dr. K," the defendant. Howe has explained that he sent this email because he did not want anyone else at CNSE or Fort Schuyler, other than himself or KALOYEROS, to learn of their scheme.

d.     As described above, on or about August 20, 2013, KALOYEROS sent to Howe and to the Fort Schuyler Executive an email directing the Fort Schuyler Executive "to issue an RFP for a strategic partner in Syracuse and a similar one in Buffalo."

e.     The following day, on or about August 21, 2013, Howe responded to KALOYEROS only, at KALOYEROS's work email address, stating "I have 'vitals' for buffalo and Syracuse friends." Howe has explained that "buffalo and Syracuse friends" referred specifically to the Buffalo Developer and the Syracuse Developer, respectively. Howe has further explained that the word "friends" was used to refer to "friends of the Governor," and that the Buffalo Developer and Syracuse Developer qualified as "friends" due, in part, to their donations to the Governor's campaigns and, in part, due to their relationship as clients of Howe. Furthermore, "vitals" referred to information about the Buffalo Developer and the Syracuse Developer that would be used to tailor the RFPs so that the Buffalo Developer's and the Syracuse Developer's proposals would be selected.

f.     Later that day, on or about August 21, 2013, KALOYEROS, using his personal "gmail" address, responded to Howe's email and stated, "Please gmail not email."[11] Howe then asked in an email to

---

[11] It appears that KALOYEROS forwarded Howe's email to his personal "gmail" address before responding.

KALOYEROS, "did you understand that gmail email I sent this morning?" KALOYEROS responded, apparently sarcastically, "Vitals is so complicated to understand that I was hoping you'd break it down for me in 3 letter words, 2 word sentences."

g.   On or about August 23, 2013, Howe sent an email to KALOYEROS at KALOYEROS's gmail account with the subject "FW: [Syracuse Developer] Company Qualifications and Experience."  Attached to that email was the Syracuse Developer Qualifications, which Howe has explained were sent to him from GERARDI and AIELLO to be used in the development of the Syracuse RFP.

h.   On or about September 13, 2013, KALOYEROS sent an email to several executives and employees of CNSE and Fort Schuyler and to Howe that contained a draft of the Syracuse RFP (the "Draft Syracuse RFP").  Howe forwarded the email and the Draft Syracuse RFP to AIELLO and GERARDI, writing "FYI---they are fine tuning now, but expect to release to public this week….what do you think? Keep Confidential pls."  Under the heading "Developer Requirements," the Draft Syracuse RFP provided, among other things, the following language, which is nearly identical to language excerpted above from the Syracuse Developer Qualifications: the developer should use "sophisticated tools and advanced capabilities (such as InSite Sitework (www.insitesortware.com) to accurately and efficiently coordinate all aspects of site and utility construction, to develop ideal building conditions, and USGlobalNet, or USGN's (www.usgn.net) web-based project management software) to effectively manage projects expeditiously, professionally, on-time, and within budget."

i.   On or about September 13, 2013, GERARDI replied by email to Howe and AIELLO, attaching a scanned version of the Draft Syracuse RFP that contained GERARDI's handwritten notes.  These handwritten notes included the following:

i.   In the paragraph of the Draft Syracuse RFP quoted above, the phrases "(such as InSite Sitework (www.insitesortware.com)" and "USGlobalNet, or USGN's (www.usgn.net)" were underlined, and in the margin was written "too telegraphed?? I would leave out these specific programs."  Based on the context of this email and others, and interviews with Howe, I believe that GERARDI was expressing his concern that including these

69

specific qualifications in the RFP would make it too obvious that the RFP was being rigged to favor the Syracuse Developer.

ii.    In a section of the Draft Syracuse RFP that stated that "the response to the RFP must specifically include . . . Latest audited financial statement for DEVELOPER," the word "audited" was crossed out in GERARDI's handwritten notes, and in the margin was written, among other things, "not available – typically prepared for not-for-profits, or public corp." Howe has explained that, based on his experience working with the Syracuse Developer, GERARDI and AIELLO were concerned about any requirement for audited financial statements because such a requirement had disqualified them from previous public contracts.

j.    On or about September 13, 2013, several hours after sending the Draft Syracuse RFP containing the handwritten notes to Howe, GERARDI sent another email to Howe, copying AIELLO, reiterating that the Syracuse RFP should not include a requirement of audited financials, and suggesting instead that it read, "Latest audited financial statement if available, or other financial information/statements that demonstrate the DEVELOPER's financial qualifications." On or about September 16, 2013, Howe sent to KALOYEROS an email stating: "On syr rfp , where it says 'audited financials' just need to add an additional few words, 'audited financials or letter of financial reference from major financial institution.'"

k.    On or about September 24, 2013, Howe forwarded to AIELLO and GERARDI a revised draft Syracuse RFP. This revised draft Syracuse RFP still contained the phrases "(such as InSite Sitework (www.insitesortware.com)" and "USGlobalNet, or USGN's (www.usgn.net)," but after the phrase "Latest audited financial statement for DEVELOPER" the phrase "or letter of financial reference from major financial institution" was included, as had been requested by AIELLO and GERARDI via Howe.

l.    Despite having retained Howe and worked with Howe to tailor the Syracuse RFP to match the qualifications of the Syracuse Developer, the Syracuse Developer's RFP submission (which was affirmed by JOSEPH GERARDI, the defendant) falsely stated that no one "was retained, employed or designated by or on behalf of [the Syracuse Developer] to attempt to influence the procurement process."

70

### iii.    The Buffalo RFP Was Designed to Defraud Fort Schuyler

79.    Based on my review of emails and interviews of, among others, Howe, I learned, that, unbeknownst to members of the Board of Directors of Fort Schuyler, the Buffalo RFP also was designed so that the Board of Directors of Fort Schuyler would have no choice but to name the Buffalo Developer the preferred developer for Buffalo, as follows:

a.    As noted above, on or about August 21, 2013, Howe sent an email to ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, stating "I have 'vitals' for buffalo and Syracuse friends."

b.    On or about August 23, 2013, Howe sent an email to KALOYEROS at his gmail account with the subject "FW: RFQ,"[12] in which Howe wrote "Attached are vitals for buffalo.  They expressed the 'broader' descriptions below help, versus narrower."  Below that text was a section that Howe has explained came from the Buffalo Developer and that began "Todd – Our thoughts for the RFQ: RFQ Requirement – Selecting based on qualifications not price is important."  Below that text were seven bullet points that were sent by MICHAEL LAIPPLE, the defendant, to be used to draft the Buffalo RFP.

c.    Also on or about August 23, 2013, an individual from an architecture firm sent to KALOYEROS, Howe, and others associated with CNSE a power point containing details, including, among other things, the location, of a potential construction project (the "Riverbend Project") to be undertaken by CNSE in Buffalo.  Howe then forwarded the email and power point regarding the Riverbend Project to LAIPPLE.

i.    Based on conversations with, among others, Howe, individuals associated with CNSE, and developers, I learned that the

---

[12] Howe has explained that he occasionally referred to the RFPs as "RFQs," which stands for "Request for Qualifications," because the RFPs requested qualifications from interested bidders, as opposed to proposals on building specific projects.

Riverbend Project was not made public prior to the Governor's announcement of the Riverbend Project on or about November 21, 2013 -- which was more than three months after Howe had forwarded information about the Riverbend Project to LAIPPLE -- and that the details associated with the Riverbend Project contained in the power point described above were not shared with any developer other than the Buffalo Developer prior to the issuance of the Buffalo RFP.

d.    Later in the day, on or about August 23, 2013, LAIPPLE sent an email to Howe stating, "One last thought on the RFQ.  If the RFQ Included something about MWBE promotion and compliance, that would be helpful."  Howe has explained that "MWBE" refers to "minority and women business enterprises," and that the Buffalo Developer believed that they were stronger than their competitors in terms of their working with MWBEs.  My review of the Buffalo Developer's website further confirmed that the Buffalo Developer publicly highlights its commitment "to proactively supporting Minority and Women-Owned Business Enterprise (MWBE)."  Later on August 23, 2013, Howe forwarded the email from LAIPPLE to KALOYEROS, stating, "Additional vital for buffalo, stronger on the mwbe than usual would help."

e.    On or about September 3, 2013, KALOYEROS responded to Howe's email from August 23, 2013 regarding the "Additional vital for buffalo," writing: "these are not unique to [the Buffalo Developer]..we need more definite specs, like minimum X years in Y, Z number of projects in high tech, etc, etc."  Howe has explained that it was his understanding based on his course of dealing with KALOYEROS that when KALOYEROS referred to "minimum X years in Y," he was asking for information about the number of years that the Buffalo Developer had worked in a particular area, so that the Buffalo RFP could be more specifically tailored to the Buffalo Developer's qualifications.

f.    On or about September 6, 2013, the Deputy State Operations Director sent an email containing a power point attachment entitled "RiverBend-FINAL.pptx" to Howe, KALOYEROS, and an executive at CNSE, with the message, "I pulled together the following ppt. A cut and paste of the various documents we have done over the last few weeks. Can you review. If all is okay, I will send for final review." The attached power point contained further details, including, among other things, the location and purpose, of the Riverbend Project. Later that day, on or about September 6, 2013, Howe forwarded this email, including the attachment, to LAIPPLE, with the message,

"Michael. FYI, confidential." LAIPPLE forwarded the email, with the attachment, to KEVIN SCHULER, the defendant.

g.     On or about September 9, 2013, KALOYEROS sent an email from his gmail address to the gmail address of LOUIS CIMINELLI, the defendant, stating, "Draft of relevant sections from RFP enclosed..obviously, we need to replace Syracuse with Buffalo and fine tune the developer requirements to fit..hopefully, this should give you a sense of where we're going with this..thoughts?"  Attached to the email was a draft of the Syracuse RFP.  Under the "Developer Requirements" section of this draft of the Syracuse RFP, the draft stated, among other things, "Over 15 years proven experience."  On the same day, CIMINELLI forwarded the email from KALOYEROS and the attached draft of the Syracuse RFP to LAIPPLE and SCHULER.

h.     On or about September 13, 2013, SCHULER sent an email to KALOYEROS, copying CIMINELLI, LAIPPLE, and Howe.  The email stated, among other things: "As Louis continues to enjoy the much warmer weather on the West Coast, I am sending along three attachments that I hope will meet your request for information."  Attached to SCHULER's email to KALOYEROS was, among other things, a two-page document entitled "Company Profile."  Included in the "Company Profile" was a statement noting that the Buffalo Developer had "over 50 years of experience."

80.    The Buffalo RFP as publicly issued in or around October 2013 contained several provisions that were not in the draft of the Syracuse RFP that ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, sent as a model on or about September 9, 2013, to LOUIS CIMINELLI, the defendant, but that were consistent with the Buffalo Developer's qualifications and I believe were included to further tailor the RFP for the Buffalo Developer, including the following:

a.     Under "Developer Requirements," the Buffalo RFP stated, "Bidder is required to comply with equal opportunities for minorities and women pursuant to section 312 of the New York Executive Law.  This includes the achievement of at least 23% Women and Minority Owned Business Enterprise participation (WMBE).  Accordingly, it is expected that DEVELOPER be able to demonstrate a track record in WMBE participation."

b.   Also under "Developer Requirements," the Buffalo RFP stated that it was seeking "a local DEVELOPER in the Greater Buffalo Area," with "Over 50 years of proven experience," which corresponded to the "Company Profile" provided to KALOYEROS by KEVIN SCHULER, the defendant.

81.   On or about November 1, 2013, an email (the "50/15 Email") was sent by the Director of Procurement for the Research Foundation to developers who had expressed interest in the Buffalo RFP indicating that the requirement of 50 years of proven experience was a typographical error and that the requirement should have been 15 years of proven experience.  Based on interviews with executives of CNSE and their related entities, I learned that it was the practice of ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, to closely edit the language of all RFPs prior to publication and was known not to miss errors or changes.  Based on these interviews, the timing of the 50/15 Email, the inclusion of the "50 years" requirement in the original RFP following KALOYEROS's receipt of the Buffalo Developer's company profile, and the emails set forth below, I believe that the original "50 years" requirement was not in fact a "typographical error."

a.   On or about November 1, 2013, the following email exchange occurred:

i.   An executive of the Buffalo Developer ("Buffalo Developer Executive-1") forwarded the 50/15 Email to LOUIS CIMINELLI and KEVIN SCHULER, the defendants, with the message "Grrrrr."

ii.   SCHULER responded, "50 was a bit obnoxious."

b.   Beginning or about November 2, 2013, the following email exchange occurred:

i.   Buffalo Developer Executive-1 replied to the 50/15 Email, stating, "We confirm receipt and understand the intent of the change."  Buffalo Developer Executive-1 then forwarded his message to two employees of the Buffalo Developer, including a marketing coordinator (the "Buffalo Developer Marketing Coordinator").

74

ii.     On or about November 4, 2013, the Buffalo
Developer Marketing Coordinator forwarded the email from Buffalo
Developer Executive-1 to SCHULER, stating, "FYI – so much for that
thought."

iii.     SCHULER responded to the Buffalo Developer
Marketing Coordinator: "15 is still pretty good."

82.   On or about November 6, 2013, ALAIN KALOYEROS, a/k/a "Dr.
K," the defendant, sent an email (the "November 6 Email") to a
representative of a large, global construction company, that stated,
among other things:

> As you know, we are in the midst of an RFP process and,
> while you are a valued and qualified partner, particularly
> for cleanrooms, we cannot endorse nor support a pre-cooked
> process or any process that singles out anyone, including
> you for business before the RFP process has been completed
> and a merit based group has been selected.

On or about November 6, 2013, KALOYEROS forwarded the November 6 Email
to Howe.  Approximately two minutes later, Howe forwarded that email
chain to MICHAEL LAIPPLE and KEVIN SCHULER, the defendants, with the
message "See below. Ouch!"

83.   Based on my review of emails and publicly available
documents and interviews of, among others, Howe, I learned that on
or about November 14, 2013, which was approximately one week before
the Governor announced the Riverbend Project publicly, Howe sent an
email to LOUIS CIMINELLI, KEVIN SCHULER, and MICHAEL LAIPPLE, the
defendants, stating, among others things, "Well looks like the
Riverbend Announcement is going to happen next Thursday .... Please
keep confidential." SCHULER responded, "How do they announce the
riverbend site in the middle of this procurement?  Site selection is
supposedly part of the eval.  Now mind you, I don't think it's a big
deal but it does need to be considered."  Based on my review of emails,
I believe that SCHULER was concerned that if the Governor announced
the Riverbend Project publicly before bids on the Buffalo RFP were
due, the Buffalo Developer could lose the improper advantage it had
secured from advanced notice that Riverbend would be the site of a
CNSE project.

84.   Based on my review of emails and publicly available
documents, and interviews of, among others, Howe and employees of
CNSE and its affiliated entities, I learned, among other things, that
on or about December 10, 2013, the Buffalo Developer submitted its
response to the Buffalo RFP, which included a proposed option of a
development at the Riverbend Project's site.  Despite having retained
Howe and worked with Howe to tailor the Buffalo RFP to match the
qualifications of the Buffalo Developer, the Buffalo Developer's RFP
submission (just like the Syracuse Developer's) falsely stated that
no one "was retained, employed or designated by or on behalf of [the
Buffalo Developer] to attempt to influence the procurement process."
Two other companies submitted responses to the Buffalo RFP.  However,
based on my review of emails between other developers, I know that
at least two other developers decided at the time not to submit
responses to the Buffalo RFP, because, among other thing, the RFP
seemed vague and appeared written to provide an advantage to a specific
company.

iv.   **Fort Schuyler Awarded Contracts to the Syracuse Developer and
Buffalo Developer**

85.   Based on interviews of employees of CNSE and members of
the Board of Directors of Fort Schuyler, I believe that the individuals
associated with Fort Schuyler involved in evaluating the responses
to the Syracuse RFP and to the Buffalo RFP and voting on awarding
the preferred developer contracts were not aware of any developer
receiving a draft of the Syracuse RFP or Buffalo RFP in advance of
their public announcements.  I learned from both employees of CNSE
and members of the Board of Directors of Fort Schuyler that they would
have viewed the pre-announcement sharing of a draft of an RFP with
a developer as an unfair and improper practice.  One member of the
Board of Directors stated that he was disappointed that only one
company -- the Syracuse Developer -- submitted a response to the
Syracuse RFP and that only three developers submitted responses to
the Buffalo RFP, because additional responses would have created
competition and yielded a better result for Fort Schuyler.

86.   Based on my review of emails and public documents and
interviews of employees of CNSE and members of the Board of Directors
of Fort Schuyler, I learned that:

a.    On or about December 18, 2013, the Syracuse Developer was chosen by vote of the Board of Directors of Fort Schuyler as the preferred developer for CNSE in Syracuse, and soon thereafter was awarded an approximately $15 million contract to construct the Film Hub.   In or around October 2015, without any further RFP, the Syracuse Developer was awarded an approximately $90 million contract to build a manufacturing plant in Syracuse.

b.    On or about January 28, 2014, by vote of the Board of Directors of Fort Schuyler, the Buffalo Developer, along with another company (the "Second Buffalo Developer"), was chosen as the preferred developer for CNSE in Buffalo.

c.    ALAIN KALOYEROS, a/k/a "Dr. K," the defendant, officially "recused" himself from the votes and accordingly he did not officially vote to select either the Syracuse Developer or the Buffalo Developer.   I believe KALOYEROS did so in order to continue to deceive the other members of the Fort Schuyler Board of Directors into believing that the bidding process was fair, open, and competitive, when in fact KALOYEROS had manipulated the process so that the Syracuse Developer and the Buffalo Developer would be chosen regardless of whether KALOYEROS was involved in the voting.

87.    Based on my review of emails and publicly available documents, and interviews of, among others, Howe and employees of CNSE and its affiliated entities, I learned, among other things, that in or around March 2014, without any further RFP process, the Buffalo Developer was chosen over the Second Buffalo Developer -- and without further competition from other interested developers -- to receive a contract worth approximately $225 million for the Riverbend Project.[13]   In or around 2014, the contract for the Riverbend project was expanded to be worth approximately $750 million.

---

[13] The Second Buffalo Developer received a contract worth approximately $25 million for another project in Buffalo, New York.

### V.   FALSE STATEMENTS BY AIELLO AND GERARDI

88.   On or about June 21, 2016, STEVEN AIELLO and JOSEPH GERARDI, the defendants, each met with law enforcement agents and prosecutors at the United States Attorney's Office.   AIELLO and GERARDI were represented by counsel, and each spoke with the Government pursuant to a proffer agreement that protected each of them from having his statements used against him except, among other things, insofar as he lied and was accordingly charged with making false statements. Before the proffers, the Government informed counsel that AIELLO and GERARDI were subjects of the Government's investigation, and warned them that the Government believed that statements that AIELLO had previously made to the FBI, which were consistent with the statements described below, were false.   During their respective proffer sessions, AIELLO and GERARDI were warned repeatedly that if they told any lies, they could be charged with a federal crime.   Moreover, both AIELLO and GERARDI were told that their respective stories did not appear to be credible, and they were given multiple opportunities to tell the truth.   During these meetings, AIELLO and GERARDI made the following statements, which I believe to be false, based on the facts set forth above:

a.   AIELLO and GERARDI each separately stated that, after AIELLO was approached by Howe in or around late spring 2014 to ask whether AIELLO would be interested in hiring JOSEPH PERCOCO, a/k/a "Herb," the defendant, to work for the Syracuse Developer, AIELLO spoke with GERARDI and they both decided not to hire or make payments to PERCOCO.   Furthermore, AIELLO and GERARDI each separately stated that they did not pay PERCOCO approximately $35,000 by sending money to Howe's shell company bank account, and they each separately stated that they had no knowledge that Howe had paid PERCOCO, and that they never authorized Howe to do so.   I believe, based on my review of emails and interviews of, among others, Howe, and as further described above, that these statements were false because AIELLO and GERARDI agreed to and did pay PERCOCO and deliberately did so through Howe's LLC in order to disguise the fact that the Syracuse Developer was making payments to PERCOCO.

b.   AIELLO and GERARDI each separately stated that Howe never asked them to make campaign contributions.   I believe, based on my review of emails and interviews of, among others, Howe, and as further described above, that these statements were false because

Howe did in fact advise AIELLO and GERARDI to make certain campaign contributions.

        c.    GERARDI stated that Howe sent the Draft Syracuse RFP to him and AIELLO in order for the Syracuse Developer to help Howe and his associated Law Firm draft a broader, more open RFP so that other companies could compete to be the preferred developer, even though drafting the RFP in this way would hurt the Syracuse Developer. GERARDI further stated that when he wrote "too telegraphed?" next to a portion of the Draft Syracuse RFP that matched, verbatim, language from the Syracuse Developer Qualifications, he meant that the section in the Draft Syracuse RFP was too narrow and should be made broader to allow other developers to apply. I believe, based on my review of emails and interviews of, among others, Howe, and as further described above, that these statements were false because AIELLO and GERARDI conspired with others to tailor the Syracuse RFP to benefit the Syracuse Developer.

    WHEREFORE, deponent respectfully requests that warrants be issued for the arrests of JOSEPH PERCOCO, a/k/a "Herb," ALAIN KALOYEROS, a/k/a "Dr. K," PETER GALBRAITH KELLY, JR., a/k/a "Braith," STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, MICHAEL LAIPPLE, and KEVIN SCHULER, the defendants, and that they be imprisoned or bailed, as the case may be.


                                    _____
                                    DELEASSA PENLAND
                                    Criminal Investigator
                                    United States Attorney's Office
                                    Southern District of New York

Sworn to before me this
20th day of September, 2016

_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK